No. 68,606

STATE OF KANSAS, *Appellee*, v. ROSE MARIE SMITH, *Appellant.*

(864 P.2d 709)

Opinion filed December 10, 1993.

*Rebecca E. Woodman*, assistant appellate defender, argued the cause, and *Wendy L. Rhyne Slayton*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with her on the brief for appellant.

*Jennifer M. Wieland*, assistant county attorney, argued the cause, and *Mary A. McDonald*, county attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion was delivered by

DAVIS, J.: The defendant, Rose Marie Smith, was convicted following a jury trial of two counts of attempted second-degree murder and one count of kidnapping. On appeal, she contends that the two attempted second-degree murder charges are multiplicitous. She raises two claims of error involving the court's instructions to the jury. Finally, she claims that the trial court abused its discretion in sentencing her to a controlling term of 20 years. Finding no reversible error, we affirm.

The defendant's convictions arise out of events that occurred on July 13, 1991, in Halstead. The defendant had met the victim, Benedict Raya, in 1989. At the time of the offenses, they had lived together on and off for about a year and a half. The police had been called several times in response to domestic disputes during 1989 and prior to the event giving rise to the present convictions. The defendant and Raya were not living together at the time of the present offenses.

The defendant asked Raya to leave and took him to a motel after a dispute occurred between them in March 1991. Raya could not find his glasses and other belongings after arriving at the motel. He testified that the defendant called him on July 10 and told him that he had left his glasses at her house. He stated that she told him she was no longer angry, that they could be friends, and that he could come by and pick up his glasses. Shortly after receiving that telephone call, Raya received a threatening call from Albert McClelland, warning him to stay away from the defendant because she was "his woman."

Before Raya went to work on the 3:00 to 11:00 shift on July 12, he left a note on the defendant's door, telling her that he would be over that night to get his glasses. After he got off work, Raya returned to his motel room, drank, and watched television until about 1:00 a.m. He then walked over to the defendant's house, believing she would be home from her work about 1:00 a.m.

No one responded to Raya's knock at the door. When he saw a car coming, he hid under a car parked in the defendant's yard because he was afraid McClelland or Pete Villarreal would be with the defendant. McClelland and the defendant got out of the

car. Raya crawled out from his hiding place when McClelland saw Raya's feet sticking out from under the car. Raya told them that he had come to get his glasses. McClelland told him to leave the area, but the defendant intervened and invited Raya into her house.

The defendant brought Raya his glasses and offered him a drink. The three of them sat in the living room having drinks. Raya and the defendant sat on the couch. According to McClelland, the defendant then started motioning for him to get an axe handle that was hanging on the wall behind him. McClelland initially shook his head no, but finally reached up and took it off the wall. After they each had a couple more drinks, the defendant began motioning for McClelland to "come on, come on . . . come over there." McClelland then got up and hit Raya five or six times on the head and shoulders with the axe handle. The defendant was "egging [McClelland] on" as he hit Raya, stating, "Hit him again. Kill him. Hit him again."

McClelland eventually quit hitting Raya, and the defendant helped Raya get up and go into the bathroom. As McClelland was fixing another drink, he heard the defendant say, "He's getting away." The defendant told McClelland to "get him." McClelland went outside, got in his car, and went to his own house, where he fixed another drink. He testified that he was trying to "kill some time" so the defendant would believe he was out looking for Raya.

Meanwhile, the defendant had called Pete Villarreal, an old friend of hers, told him Raya was "lurking around again," and asked Villarreal if he could come over. He did so, and when he arrived, he saw the defendant covered with blood and cleaning up blood from the floor. The defendant told Villarreal that McClelland had just "knocked the hell out of [Raya], and he's out looking for him." Villarreal got in his car and started looking for Raya too.

Villarreal spotted Raya walking on the street, but when Raya saw Villarreal, Raya disappeared. Eventually, Raya, Villarreal, and McClelland all ended up at the defendant's house. Raya sat in the bathtub while the defendant wiped blood off of him. McClelland went into the kitchen to fix another drink and heard "whack, whack, whack," several times. He returned to the bath-

room to find Villarreal reaching through the bathroom window, hitting Raya on the head with a stick.

According to McClelland, he entered the bathroom and saw the defendant, Raya, and Villarreal struggling over a knife. McClelland testified that the defendant was hitting Raya in the groin during the struggle over the knife. According to Villarreal, McClelland hit Raya on the neck with a hatchet. When Raya tried to defend himself against the hatchet, Villarreal hit him with a stick. Villarreal saw a knife lying by Raya's feet.

Eventually, Raya lay immobile on the floor. The defendant checked Raya's pulse and said, "He's awful tricky. You can't trust him." According to McClelland, the defendant "was standing there telling him just to lie down and die. . . . And she walked into the other room, got her pistol, came up there and put it to [Raya's] head and pulled the trigger and it didn't go off. . . . It just clicked." The defendant made some comment about "the damned thing won't work when you want it to." The defendant then put the gun down, came back, checked Raya's pulse and said, "Well, he's dead."

The defendant or Villarreal said something about getting garbage bags to put the body in. Villarreal suggested they dump Raya's body in Hutchinson "because that's his home." McClelland said he knew a place to "dump trash." The defendant stated that she wanted to get a sharp knife so she could cut Raya's body up into little pieces and "scatter him in the Arkansas River." According to McClelland, he and Villarreal tied Raya's hands, although it did not make much sense because they believed he was dead. McClelland also testified that they put a garbage bag over Raya's head and one over his feet "[s]o we wouldn't get blood all over the rest of the carpet and stuff." They also wrapped Raya in blankets. McClelland, Villarreal, and the defendant loaded Raya into the back seat of the car McClelland was driving.

They decided to take the body to a sand pit near Hutchinson. McClelland, Villarreal, and the defendant got in the front seat of McClelland's car, and McClelland drove Villarreal to get his car. McClelland and the defendant went to get gas, and Villarreal said he would meet them on the west side of town. At the gas station Raya sat up in the back seat; he had managed to free his hands and get the garbage bag off of his head. He was crying

out, "Help me, they're trying to kill me." Raya kept asking the defendant, "Why?" She replied, "I want you dead. I want you out of my life."

Villarreal did not meet them on the west side of town, so McClelland drove without him to an area outside of Hutchinson where McClelland had dumped trash before. On the way, the defendant repeated that she needed a sharp knife so that she could cut Raya up into little pieces so no one would find his body. McClelland told the defendant that he was just going to take Raya out and dump him. Raya kept repeating that he loved the defendant and kept asking her, "Why?"

As McClelland and the defendant were looking for a place to dispose of Raya, he managed to jump out of the car. McClelland immediately stopped the car. The defendant told McClelland to "hit him, finish him." McClelland took his foot off of the brake and accelerated a little; the defendant grabbed the wheel, and while they both held the wheel the car struck Raya and knocked him into a field. After the car struck Raya, the defendant again began talking about needing to get a knife to cut up his body so it would not be found. They left Raya in the field and headed back toward town.

On the way, the defendant told McClelland to stop on a bridge so that she could dispose of the blankets, garbage bags, and rope. McClelland took the defendant home, and on the way she complained to McClelland that he could not do anything right. McClelland dropped off the defendant at her house and went home.

Raya survived the brutal attacks, gave statements to the police, and testified at trial. At trial he testified that he remembered McClelland hitting him over the head until he lost consciousness at the defendant's house. When he came to, he heard someone saying "cut his throat," and Villarreal cut Raya's throat. Raya passed out again, and the next thing he remembered was someone saying to tie his hands and put a plastic bag over his head. He did not hear the defendant's voice or notice her presence at that time. He then remembered waking up in the defendant's bathtub, untied, and he may have pushed the defendant away before he got out of the house. He remembered running from house to house seeking help, but no one would answer their doors; trying

to run down a road and being struck by a car; and someone say, "[S]hoot him and make sure he [is] dead," and pretending that he was dead. He did not recall the defendant's participation but recalled that he seemed to slip in and out of consciousness. When he was conscious, his vision was obstructed by blood.

## MULTIPLICITY

The defendant argues that the State used a single wrongful act to support two charges of attempted second-degree murder, thereby violating her right against double jeopardy.

" ' "Multiplicity exists when the State uses 'a single wrongful act as the basis for multiple charges.' [Citation omitted.] Charges are not multiplicitous if each charge requires proof of a fact not required in proving the other. [Citation omitted.] . . . Offenses are also not multiplicitous when they occur at different times and different places, because they cannot then be said to arise out of a single wrongful act." *State v. Howard*, 243 Kan. 699, 703, 763 P.2d 607 (1988). . . .

. . . .

" 'Multiplicity does *not* exist if an act of violence is intermittent or separate and wholly unrelated to the other acts of violence. *State v. Bourne*, 233 Kan. 166, 168, 660 P.2d 565 (1983). If there is a "break in the action" or if "offenses occurred at separate times and in separate places," the charges are not multiplicitous. *Bishop*, 240 Kan. at 653-54; see *State v. James*, 216 Kan. 235, 531 P.2d 70 (1975).' " *State v. Warren*, 252 Kan. 169, 175-76, 843 P.2d 224 (1992).

The State's theory was that all violent acts against the victim Raya occurring in the residence constituted one count of attempted murder. Those violent acts occurring after Raya left the residence constituted the second count of attempted murder. In its closing argument, the State contended that the first attempted murder occurred before Raya sat up at the gas station and the second occurred after the defendant, McClelland, and Raya left the gas station. We are not asked to and do not determine if more than one count of attempted murder could have been charged on events at the residence.

We have held that " '[w]here offenses are committed separately and severally, at different times and at different places, they cannot be said to arise out of a single wrongful act.' " *Warren*, 252 Kan. at 175. The evidence of record establishes that the first attempt occurred at the defendant's home, and all of the perpetrators believed they had been successful in their attempt to

kill Raya. The second attempt occurred later and at a different location, near the Hutchinson sand pit. Significantly, it also occurred after a "break in the action" with respect to the first attempted murder. See *State v. Bishop*, 240 Kan. 647, 653-54, 732 P.2d 765 (1987).

The defendant cites several cases in support of her claim that the charges were multiplicitous, but each involved a single, continuous act. *State v. Racey*, 225 Kan. 404, 409, 590 P.2d 1064 (1979) (continuing unbroken act of force could not support both aggravated assault and kidnapping charges); *State v. Dorsey*, 224 Kan. 152, 156, 578 P.2d 261 (1978) (continuous multiple sexual assaults on one victim by one defendant in the course of one hour, separated only by a few minutes, would not support multiple convictions for the same crime, but would support convictions of kidnapping, rape, and oral sodomy); *State v. Lassley*, 218 Kan. 758, 761-62, 545 P.2d 383 (1976) (defendant kidnapped victim for purpose of committing rape; same act of force could not support additional charge of aggravated assault).

The case before us is more comparable to *State v. Garnes*, 229 Kan. 368, 624 P.2d 448 (1981), and *State v. James*, 216 Kan. 235, 531 P.2d 70 (1975). In *Garnes*, the defendant, the victim, and a man named Pennington were at a club. A fight broke out outside the club and the defendant fired a shot that struck the victim. The three of them then got into a car and eventually ended up out in the country. Pennington put a gun to the victim's head; he then stabbed her with a knife and pushed her out of the car. He instructed the defendant to kill her. The defendant stabbed the victim several times, after which Pennington and the defendant took the victim's clothes and drove the car over the victim several times. The victim survived this brutal attack. The defendant was convicted of two counts of aggravated battery, one count of aggravated robbery, and one count of attempted murder. On appeal she argued, *inter alia,* that the two aggravated battery counts were multiplicitous with the attempted murder count because there was one continuous series of events and the shooting and stabbing served as the overt acts to support the attempted murder charge. 229 Kan. at 372. We held that the shooting was separate and distinct from what occurred later in the field, several miles away. The victim entered the car, presumably to be taken

to a hospital for treatment. 229 Kan. at 373. We held that Count II, charging aggravated battery by stabbing, was multiplicitous with the attempted murder charge because the victim was not stabbed until the car stopped in a remote field where she was stabbed several times, disrobed, run over several times, and left to die. Without the stabbing and running over, there likely would have been no attempted murder. 229 Kan. at 373-74.

In this case, as in *Garnes*, the acts at the defendant's house that amounted to attempted murder were separate and distinct from what occurred at the Hutchinson sand pit. As in *James*, if nothing more had happened in the field, the events that occurred before the stop at the gas station would have supported a charge of attempted murder. The two acts of attempted second-degree murder were committed separately and severally, at different times and at different places, and the charges may not be said to arise out of the same wrongful act. Thus, the charges are not multiplicitous.

## INSTRUCTIONAL ERROR

### A. Instruction on Voluntary Intoxication

The defendant requested the court to instruct the jury in accordance with PIK Crim. 3d 54.12-A regarding voluntary intoxication. The trial court refused to instruct the jury on voluntary intoxication, finding no evidence to support such an instruction.

The defendant argues that the evidence that she had consumed several drinks, had a blood alcohol concentration of .09 five to six hours after the last encounter with the victim, and was semi-conscious and non-responsive to pain several hours after the last encounter with the victim required the court to instruct the jury on voluntary intoxication.

"[A] defendant is entitled to an instruction on his or her theory of the case even though the evidence is slight and supported only by defendant's own testimony." *State v. Hunter*, 241 Kan. 629, 646, 740 P.2d 559 (1987). Voluntary intoxication may be a defense to a specific intent crime such as attempted second-degree murder, and such an instruction is required if there is evidence to support it. *State v. Sterling*, 235 Kan. 526, Syl. ¶ 2, 680 P.2d 301 (1984).

The evidence necessary to support the giving of a voluntary intoxication instruction, however, is "evidence of intoxication upon which a jury might find that a defendant's mental faculties were impaired to the extent that he [or she] was incapable of forming the necessary specific intent required to commit the crime." *State v. Shehan*, 242 Kan. 127, Syl. ¶ 5, 744 P.2d 824 (1987).

The only evidence that the defendant was intoxicated was evidence of her condition between 11:00 a.m. and noon on July 13. This evidence does not require that the court instruct the jury on voluntary intoxication because it is evidence of her condition five to six hours after her last contact with the victim. The defendant did not testify, and there is no evidence about her conduct between the time that she arrived home early in the morning on July 13 and the time the authorities found her unresponsive about 11:00 that morning.

Although there is evidence that the defendant consumed several drinks before and during the time she was with Raya, there was no evidence that she was so intoxicated that it impaired her ability to form the necessary specific intent. There was only evidence that she and her companions had consumed several drinks over a period of several hours. Viewing the evidence in a light most favorable to the defendant, there was evidence that she consumed approximately seven mixed drinks between 11:00 p.m., when she got off work, and 6:00 a.m., when they arrived out in the country to dump Raya's body. There was evidence that her blood alcohol concentration was .09 between 11:20 a.m. and 12:10 p.m. on that day and that she was not responsive to verbal or painful stimuli at around 11:00 a.m.

There was considerable evidence that the defendant formed precisely the requisite intent. It was the defendant who prompted McClelland to start beating Raya with an axe handle. As McClelland hit Raya, the defendant told him, "[H]it him again, kill him." When Raya escaped from her house, she sent McClelland to "get him" because Raya was getting away. She called Villarreal to help because Raya was "lurking around again." She made efforts to conceal evidence of the crime at her home by cleaning up the blood and upon her return from the Hutchinson sand pit by dropping evidence over the bridge.

As the men struggled over the knife, she participated by striking Raya repeatedly in the groin. When Raya lay immobilized on the floor, she touched his pulse to make sure he was dead, commenting that he was "tricky" and could not be trusted. She kept telling Raya to die and eventually got a gun, held it to his head, and pulled the trigger. When it did not fire, she expressed dissatisfaction that the "damned thing won't work when you want it to." She again checked Raya's pulse and pronounced him dead. Her actions at the Hutchinson sand pit indicate that she had presence of mind to grab the wheel, direct the car toward Raya, and strike him. After they hit him with the car, she again talked about wanting a knife so she could cut up his body into little pieces. She made efforts to conceal the crime by disposing of the blankets and bags over a bridge on her way home. She complained that McClelland could not do anything right. Under these circumstances, there is very little, if any, doubt that the defendant had the necessary intent to carry out the crimes for which she was convicted. There was not sufficient evidence to warrant an instruction on voluntary intoxication. The defendant has not met her burden of showing that she was so intoxicated that her mental faculties were so impaired that she could not form the requisite intent. *State v. Minski*, 252 Kan. 806, Syl. ¶ 3, 850 P.2d 809 (1993).

### B. Self-defense

The defendant requested a self-defense instruction at trial based on a theory that she acted in self-defense as a result of the battered woman syndrome.

The defendant presented considerable evidence about the violent relationship between herself and Raya, one that often resulted in the police being called to resolve disputes. Dr. Howard Brodsky, a licensed clinical psychologist, also testified about the battered woman syndrome. He had evaluated the defendant and concluded that she "fit the diagnostic" pattern of post-traumatic stress disorder, of which the battered woman syndrome is a type.

We have addressed when a self-defense instruction is required in cases involving allegations of long-term domestic abuse of a defendant. Under such circumstances, a self-defense instruction is appropriate when "circumstances surrounding the killing were

sufficient to create a reasonable belief in the defendant that the use of deadly force was necessary." *State v. Stewart*, 243 Kan. 639, Syl. ¶ 4, 763 P.2d 572 (1988).

The defendant argues on appeal that because Raya was hidden under a parked car when the defendant arrived home in the early hours of the morning and because of the defendant's history with Raya, "it is easy to see how and why she or any other reasonably prudent battered woman would have perceived that as an aggressive act requiring defense."

The defendant's argument ignores the two-pronged test this court applies to determine the propriety of a self-defense instruction, even in battered spouse cases.

"We first use a subjective standard to determine whether the defendant sincerely and honestly believed it necessary to kill in order to defend. We then use an objective standard to determine whether defendant's belief was reasonable—specifically, whether a reasonable person in defendant's circumstances would have perceived self-defense as necessary." *Stewart*, 243 Kan. 639, Syl. ¶ 5.

There is no evidence about the defendant's actual belief at the time of the attempted killing. We have evidence of her conduct and the effects of her conduct, but there is no evidence in the record that she believed it was necessary to kill Raya in order to protect herself.

There also must be some showing that such belief was reasonable. "[S]ome showing of an imminent threat or a confrontational circumstance involving an overt act by an aggressor [must be made]. There is no exception to this requirement where the defendant has suffered long-term domestic abuse and the victim is the abuser." *Stewart*, 243 Kan. 639, Syl. ¶ 4. The only arguable "overt act" by Raya in this case is that he was hiding under the car when the defendant arrived home about 1:00 a.m.

The defendant has not satisfied the criteria this court specified in Stewart for a self-defense instruction in an action involving an allegedly battered woman. The trial court, therefore, did not err in refusing to instruct the jury on self-defense.

## SENTENCE

The defendant argues that the trial court abused its discretion in sentencing her primarily because she was the least culpable

of the three defendants and received a significantly longer sentence than McClelland or Villarreal. Villarreal had pleaded no contest to one count of aggravated battery, a class C felony, and the court imposed a sentence of 3 to 10 years. McClelland, on the other hand, had pleaded no contest to one count of attempted murder in the first degree, a class B felony, and no contest to one count of aggravated battery, a class C felony. The court sentenced McClelland to a term of 8 to 20 years for the attempted murder and to a concurrent term of 3 to 10 years for the aggravated battery. The defendant in this case was sentenced to two terms of 5 to 10 years for the attempted second-degree murder counts and 15 years to life for the kidnapping count. One attempted murder sentence was to be served consecutively to the remaining terms, which were to be served concurrently with each other, for a controlling term of 20 years.

Generally, "[t]his court will not disturb a sentence imposed by a trial court on the ground it is excessive, provided it is within the statutory limits and within the realm of the trial court's discretion and not the result of partiality, prejudice, oppression, or corrupt motive." *State v. Stallings*, 246 Kan. 642, Syl. ¶ 5, 792 P.2d 1013 (1990). Disparity in the sentences of the codefendants does not amount to abuse of discretion "where the trial court considers the individual characteristics of the defendant being sentenced, the harm caused by that defendant, and the prior criminal conduct of that defendant." *Stallings*, 246 Kan. 642, Syl. ¶ 6.

The defendant argues that she did not inflict the harm caused to Raya, but that McClelland and Villarreal performed the actual violent acts. She also argues that these were her first felony convictions. Thus, she argues that under Stallings, her longer sentence is not justified. She also argues that *State v. Bailey*, 251 Kan. 527, 834 P.2d 1353 (1992), requires the trial court to articulate on the record its reasons for imposing a longer sentence on her than on McClelland or Villarreal.

In *Bailey*, two defendants convicted of the same crimes received identical sentences, but one was to be served consecutively and the other concurrently. The result was that one defendant was required to serve 45 years before he was eligible for parole while the other had to serve only 30 years. 251 Kan. at 529. We

noted in *Bailey* that a trial court is not restricted to imposing a sentence less than or equal to a codefendant's sentence, but that the legislature's new sentencing guidelines expressed an intent that similarly situated defendants should receive similar sentences. The trial court in *Bailey* had "summarily dismissed the difference in parole eligibility by saying the codefendant's sentence was not relevant." 251 Kan. at 531. Given the record's indication that the defendant receiving the longer "actual" prison term was less culpable than the other defendant, this court held the trial court erred in not considering the disparity and remanded for resentencing. The court directed that "[t]he trial court . . . must consider the sentence given the codefendant and, if a longer sentence is given, the reason for doing so should be set forth on the record." 251 Kan. at 531.

At the outset, we note that McClelland and Villarreal were not sentenced for the same offenses nor the same number of offenses. Although McClelland pleaded guilty to one count of attempted first-degree murder, his sentence of 8 to 20 years was longer than defendant's 5- to 20-year sentence for one count of attempted second-degree murder. McClelland and Villarreal each also pleaded guilty to aggravated battery, for which they received 3- to 10-year sentences, but the defendant was not convicted of aggravated battery, so there is no comparable charge. The defendant's remaining attempted second-degree murder conviction drew a sentence identical to her other attempted murder conviction of 5 to 20 years. Her remaining conviction was for a class B felony, kidnapping. Villarreal and McClelland had no comparable convictions.

Although the trial court did not expressly comment on the other defendants' sentences, the trial court here was aware of the sentences imposed on Villarreal and McClelland. The same judge presided over their sentencing as presided over the defendant's sentencing. Moreover, at the sentencing hearing, defense counsel argued that the punishment given to McClelland and Villarreal should "be used as a measuring stick about what an appropriate punishment for Rose Smith would be." Defense counsel reminded the court what McClelland's and Villarreal's sentences were and argued that the defendant's limited involvement entitled her to a less severe sentence.

Although the court never expressly stated that it was imposing a more severe sentence on the defendant because of any particular factors, the record clearly indicates that the court considered the defendant's role in the offenses as her role related to the other defendants. The court noted that the defendant invited Raya to her home and that she began indicating to McClelland that he should get the axe handle and hit Raya with it. The court noted that Villarreal would not have even been in the same city that night if the defendant had not called him and asked him to come over. The court also noted that the defendant urged Villarreal to begin attacking Raya. The court perceived the evidence to support the conclusion that the defendant began cleaning blood off the victim to "keep him there until the other two men came back." The court stated that "if it had not been for this defendant, Mr. Villarreal and Mr. McClelland probably would not have been involved in this episode at all." The court also noted that it was at the defendant's urging that McClelland tried to run over Raya and that it was McClelland who eventually terminated the episode by taking the defendant home. It was the defendant who asked McClelland to stop so she could dispose of bloody evidence from the car, and it was the defendant who chastised McClelland for being ineffectual. The court concluded that "this defendant was at the base and the cause of this episode—these episodes."

The defendant received a much harsher sentence than McClelland or Villarreal. The defendant was convicted of different crimes, however, and the court stated that it perceived her to be the driving force behind the initiation and continuation of the offenses. Given the differences in crimes and the court's statements on the record, *Bailey's* requirements are satisfied. Under these circumstances, the disparity is not "the result of partiality, prejudice, oppression, or corrupt motive. *Stallings*, 246 Kan. 642, Syl. ¶ 5.

Affirmed.