(48 P.3d 8)
No. 86,536

STATE OF KANSAS, *Appellee*, v. MICHELLE SWEAT, *Appellant*.

Opinion filed June 21, 2002.

*Rick Kittel*, assistant appellate defender, and *Randall L. Hodgkinson*, deputy appellate defender, for appellant.

*Keith E. Schroeder*, county attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before PIERRON, P.J., BEIER, J., and BUCHELE, S.J.

BEIER, J.: Michelle Sweat appeals her jury convictions for attempted first-degree murder, conspiracy to commit first-degree murder, and aggravated burglary. She also challenges her sentences as disproportionate to those given her coconspirator.

The charges against Sweat arose out of the shotgun shooting of Lloyd Eddens, who collapsed on his neighbor's front porch after being shot in his home. When police arrived, Eddens' intestines lay outside of his body and in his arms. Despite his wounds, Eddens was able to identify Sweat as the woman who had been at his house with the man who shot him.

The next day, the police interviewed Armando Fierro, then 18 years old. Fierro admitted to shooting Eddens accidentally while executing a plan concocted by Sweat to kill Eddens by a less gruesome method. Before Sweat's trial, Fierro pleaded guilty to attempted first-degree murder, conspiracy to commit first-degree murder, and aggravated burglary. He testified against Sweat.

Fierro's story was that he knew Sweat through her son and that she had recruited him to help kill Eddens. According to her plan, Sweat was to enter Edden's house first, send him out on errand, call Fierro in from her car, and then await Eddens' return. When Eddens came back, Fierro was to force him to the ground by means of the shotgun. Then Sweat was to handcuff Eddens and inject air into his veins. The plan went awry when Eddens grabbed the shotgun and it accidentally fired into his belly.

Fierro and Sweat fled to Sweat's car and disposed of their shoes as well as the syringes, handcuffs, and shotgun they had collected

in preparation for the killing. They also attempted to clean the car inside and out. Fierro, apparently on his own, later returned to a park where he and Sweat had disposed of the syringes, handcuffs, and shotgun and redistributed these items to multiple disposal sites.

Sweat was interviewed the day after Fierro. At the opening of her videotaped interview, she was advised of her *Miranda* rights, and she signed a written waiver of them. Although she appeared tired, she did not appear to be irrational or under the influence of alcohol or drugs. The interviewing detectives acknowledged that Sweat had said she had taken Valium, but they did not ask her about it. During the interview, Sweat claimed she was an innocent victim and did not know the person who shot Eddens. At trial she continued to maintain her innocence but admitted knowing that Fierro wielded the shotgun.

Additional pertinent facts will be reviewed as we discuss Sweat's various claims.

## Sufficiency of Complaint

After Sweat was convicted, she filed a motion to arrest judgment, challenging her convictions for conspiracy and attempted first-degree murder because the prosecution failed to allege the overt acts that supported those offenses. The complaint read in pertinent part:

"[O]n or about the 23rd day of June, 2000, in said County of Reno and State of Kansas, one MICHELLE L. SWEAT then and there being, did then and there, unlawfully, FELONIOUSLY, and willfully: . . . commit an overt act towards the perpetration of the crime of Murder in the First Degree, to-wit: intentionally and with premeditation kill the person of Lloyd Eddens, who intended to commit said crime, but failed in the perpetration thereof or was prevented or intercepted in executing such crime.

". . . On or about the 23rd day of June, 2000, in said County of Reno and State of Kansas, one MICHELLE L. SWEAT then and there being, did then and there, unlawfully, FELONIOUSLY, and willfully: agree with another person, to-wit: Armando Fierro, to commit the crime or to assist in committing the crime of Murder in the First Degree, to-wit: intentionally and with premeditation kill Lloyd Eddens, in an overt act, and further such conspiracy was committed by such person or said co-conspirator."

After oral argument, the district court denied the motion, finding the complaint comported with the statutes and Sweat "was adequately advised of what she was charged with."

The motion for arrest of judgment sets up Sweat's first issue on this appeal. She argues that the district court erred by denying her motion and that her convictions for attempted first-degree murder and conspiracy to commit first-degree murder must be reversed.

The sufficiency of a charging document to confer jurisdiction is a question of law over which this court has unlimited review. *State v. Hooker*, 271 Kan. 52, 60, 21 P.3d 964 (2001). Because Sweat properly preserved her issue regarding the sufficiency of the complaint through a motion to arrest judgment, the following test controls:

" 'In Kansas, all crimes are statutory and the elements necessary to constitute a crime must be gathered wholly from the statute. An information which omits one or more of the essential elements of the crimes it attempts to charge is jurisdictionally and fatally defective, and a conviction based on such an information must be reversed.' " *State v. Crockett*, 26 Kan. App. 2d 202, 205, 987 P.2d 1101 (1999) (quoting *State v. Sanford*, 250 Kan. 592, 601, 830 P.2d 14 [1992]).

We look first at the sufficiency of the complaint's allegation of conspiracy.

K.S.A. 21-3302(a) provides:

"A conspiracy is an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator."

Sweat relies upon *Crockett* in support of her argument that the complaint is fatally defective because it failed to allege the particular overt act committed by her or Fierro in furtherance of their conspiracy. Crockett also was convicted of conspiracy to commit first-degree murder. The charging document in his case read:

" 'Raymond J. Crockett, Jr. and one Ronnell F. Jones did unlawfully, feloniously, knowingly and willfully enter into an agreement with one another to commit a crime, to-wit: First Degree Murder, as defined by K.S.A. §21-3401, and in furtherance of such agreement committed the following overt acts, to-wit: planning on the time, location and manner of killing Terrance Canada, in violation of K.S.A. §21-3302.' " 26 Kan. App. 2d at 203.

On appeal, a panel of this court first noted that K.S.A. 21-3302(a) requires a charge of conspiracy to include an allegation of the overt act upon which the charge is based. The panel then held that conversations among coconspirators to form and plan the conspiracy did not qualify as overt acts in furtherance of it. Thus the charging document alleging " 'planning on the time, location and manner' " of killing the victim was fatally defective. 26 Kan. App. 2d 202, Syl. ¶¶ 5 and 6.

The flaw in the complaint in this case is even more obvious than the flaw in Crockett's information. Sweat's complaint does not even attempt to allege any specific overt act committed in furtherance of the conspiracy. It is not sufficient to say merely that the defendant willfully agreed with another person to commit the crime or to assist in committing the crime. Her conspiracy conviction must therefore be reversed; the district court lacked jurisdiction to try her on that charge.

We reach the opposite conclusion on the attempt charge.

On this charge, Sweat first argues the language of the complaint was defective because it also omitted any allegation of a specific overt act.

K.S.A. 21-3301(a) provides in relevant part: "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

Sweat's argument is without merit. The attempt statute is different from the conspiracy statute because attempt does not include a requirement that the overt act be "alleged" as well as proved. See K.S.A. 21-3302(a).

Furthermore, *State v. Humphrey*, 252 Kan. 6, 845 P.2d 592 (1992), resolved this issue adversely to Sweat. Humphrey was charged with two counts of attempted first-degree murder, and the complaint read in pertinent part: " '[Humphrey] unlawfully, feloniously and willfully [committed] an overt act towards the perpetration of the crime of Premeditated Murder of Tina [Gray] on 12-22-87 as defined by Section 21-3401 K.S.A. with the intent to commit said crime, but failed in the perpetration thereof.' " 252 Kan. at 28. As in this case, Humphrey argued on appeal that the

information was fatally defective and void because it did " 'not state what the overt act was nor does the information state why or how there was a failure in the perpetration thereof.' " 252 Kan. at 28. The Kansas Supreme Court ruled that such specificity was not required.

Sweat's second argument attacking the language of the complaint on attempt is based on the State's presentation of evidence of multiple overt acts toward the perpetration of the crime of first-degree murder. Sweat contends that a real possibility that jurors might not be unanimous on the particular overt act existed, and she points to *State v. Smith*, 268 Kan. 222, 993 P.2d 1213 (1999), for support. *Smith* is distinguishable from this case because it deals with a conspiracy charge rather than an attempt charge.

*State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), provides more guidance on this multiple acts challenge to the attempt charge. Kleypas argued that an attempted rape jury instruction was clearly erroneous because it failed to specify the overt act that would support conviction. Because the jury was required to be unanimous on the overt act committed, he argued, the court should have required either that the State elect an overt act or that the jury instructions include a multiple acts unanimity instruction. The Kansas Supreme Court rejected Kleypas' argument:

"[T]he attempted rape charge at hand presents neither a multiple acts nor an alternative means situation. The possible overt acts need not themselves be illegal or chargeable as criminal offenses and, thus, this is not a multiple acts case. Nor are the overt acts alternative means of committing the offense. Rather, they are acts, however innocent in themselves, which signify and trigger liability for the offense of attempt. As such, there was no requirement that the jury be instructed as to a specific overt act." 272 Kan. at 942.

Applying *Kleypas* to this case, the failure to specify a single overt act for the jury to rely upon on the attempt charge did not create a multiple acts problem.

## Suppression of Statements

Sweat also argues on appeal that her statements to police should have been suppressed because she had taken eight Valium in the hour before she was interviewed. She also testified that she had

trouble walking into the building where she was interviewed, that she was very tired during the interview, that she was not aware of all of the questions being asked, and that one of the detectives had asked her if she was going to pass out. She also said she did not remember signing the form waiving her *Miranda* rights. After a hearing in which the district court viewed at least part of the videotape of Sweat's interview with the detectives, Sweat's motion to suppress her statements to the police was denied.

"Voluntariness of a confession is determined from the totality of the circumstances, and where a trial court conducts a full prehearing on the admissibility of extrajudicial statements by the accused, determines the statements were freely and voluntarily given, and admits the statements into evidence at trial, appellate courts accept that determination if supported by substantial competent evidence and do not attempt to reweigh the evidence." *State v. McCorkendale*, 267 Kan. 263, 270-71, 979 P.2d 1239 (1999).

In *State v. Norris*, 244 Kan. 326, 768 P.2d 296 (1989), Norris argued his statements were involuntary because of pain from an injury, lack of sleep, and intoxication. He had consumed more than half of a case of beer and some whiskey the day of the murder; and his treating doctor, an arresting officer, and a detective conducting the interrogation all noticed an odor of alcohol. However, no one observed anything unusual about his speech or mannerisms to suggest intoxication. Norris' speech sounded normal and clear in the tape recording of the interrogation.

The *Norris* court first noted that " '[t]he fact that an accused had been drinking and using drugs does not per se establish involuntariness.' " 244 Kan. at 334-35 (quoting *State v. Baker*, 4 Kan. App. 2d 340, 343, 606 P.2d 120 [1980]). Noting that the defendant's trial testimony did not deviate significantly from his statements during the interrogation, the court concluded substantial competent evidence supported admission of the statements.

Similarly in *State v. Cribbs*, 29 Kan. App. 2d 919, 34 P.3d 76 (2001), Cribbs argued he was entitled to suppression of his statement to police because he testified that he was smoking marijuana and freebasing crack before the interview. An interviewing officer testified that Cribbs stuttered when he got nervous and cried during part of the interview, but he appeared to be sober, was not

glassy-eyed, did not slur his speech, and had normal balance. The officer did not smell any intoxicants, and Cribbs did not admit to any drug use that day.

Relying on *Norris*, this court first noted that drinking and drug use does not per se establish involuntariness. Pointing out that the defendant's statements outlined essentially the same version of events he later testified to, we found that, under the totality of the circumstances, substantial competent evidence supported the district court's finding of voluntariness. *Cribbs*, 29 Kan. App. 2d at 927.

This case is analogous to *Norris* and *Cribbs*. First, Sweat's version of events at the interview was substantially the same as her testimony at trial; the only significant difference was her early denial that she knew the shooter. Second, evidence was presented that Sweat took Valium prior to the interview, and the officers had some knowledge of this. Although she appeared tired, the interviewing officers testified that she did not appear to be under the influence of alcohol or drugs, did not appear irrational, and appeared to understand and answer the questions appropriately. The district court reviewed the videotape and pointed out that she never said she did not understand a question, that she told her side of the story without interruption, and that she did not appear to be a person who was impaired by her ingestion of Valium.

The videotape of the interview and the officers' testimony provide substantial competent evidence to support the district court's finding of voluntariness. During the interview, Sweat spoke very clearly, was animated at times, argued with the officers, and appeared to understand what was going on. Although she intermittently put her head down, she appeared to adopt this posture when her responses were being challenged. The only time she put her head down for an extended period of time was when the officers were outside of the room. There was no error in the district court's denial of her motion to suppress.

### Testimony of Defense Attorney's Former Client

Before trial, the prosecutor moved to endorse Kerri Raine as a witness. Defense counsel objected because he had represented

Raine on a separate criminal matter while she was sharing a cell with Sweat. The district court granted the motion to endorse.

When the State called Raine as a witness during Sweat's trial, defense counsel again objected because of the prior representation. The following colloquy then occurred:

"MR. FRIEDEN: Even before the jury gets in here, I do want to note my objection to Miss Raine's testimony. I represented her previously. I want to note my objection. I think we've argued about this at the motion for endorsement of witnesses, so now that Miss Raine is now in the room.

"THE COURT: As I understand it your representation of her was in another entirely different matter.

"MR. FRIEDEN: Yes, not related to this.

"THE COURT: She's been incarcerated as a result of that, but the questions that are going to be p[ropounded] to her today have nothing to do with that incarceration?

"MR. FRIEDEN: No.

"THE COURT: And I'm not sure what, if in fact —

"MR. FRIEDEN: I know Miss Raine. I know that she may object to me cross-examining her. I don't know whether she would or not, but I do want to point out my prior representation.

"THE COURT: You're representing an entirely different client in an entirely different matter. You know you're not the first public defender to be put in this position, and there is no conflict."

Raine ultimately testified Sweat had told her while they were sharing a cell that Sweat and "some little boy" had planned to scare Eddens because he was threatening to tell Sweat's husband something, and Eddens had $10,000 to $20,000 in his house. Sweat described purchasing syringes at a drugstore in preparation for the crime and said she was worried police would obtain a videotape from the store. She also was concerned that the police would find the knife she had dropped at the crime scene, and she said she regretted using the boy because he had told his friends.

The determination of the existence of a conflict of interest requiring disqualification of an attorney is governed by an abuse of discretion standard. See *In re Habeas Corpus Petition of Hoang*, 245 Kan. 560, 566, 781 P.2d 731 (1989), *cert. denied* 494 U.S. 1070 (1990). Sweat argues her conviction must be reversed because the district court did not conduct an appropriate inquiry into whether a conflict of interest existed, relying on *Holloway v. Arkansas*, 435

U.S. 475, 484, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978); *Hoang*, 245 Kan. at 565-66; and *State v. Jenkins*, 257 Kan. 1074, 1081, 898 P.2d 1121 (1995).

In *Holloway*, three codefendants filed pretrial motions for appointment of separate counsel after their appointed counsel said there was a risk of representing conflicting interests. The district court denied the motions and the codefendants were convicted. On appeal, the United States Supreme Court found the district court's failure to appoint separate counsel or assure itself that the risk of conflict was slim deprived the petitioners of effective assistance of counsel. Reversal was held to be automatic whenever a district court improperly required joint representation over timely objection. 435 U.S. at 488.

In *Hoang*, Hoang was represented by counsel from the public defender's office. When the district court was informed that defense counsel's office had represented the key prosecution witness against Hoang, the district court found a conflict of interest existed, disqualified defense counsel, and declared a mistrial. Hoang's new counsel moved to dismiss the charges on the grounds that the mistrial was granted improperly and would result in double jeopardy, and the motion was denied. On appeal, Hoang argued the district court abused its discretion by finding a conflict of interest existed and disqualifying defense counsel.

The Supreme Court first noted the district judge's obligation when faced with a situation in which defense counsel may have a conflict of interest because of prior representation of a prosecution witness:

"The judge must consider the whole picture not just the desires of the parties. The balancing of interests becomes extremely involved. If a defense attorney's scope of cross-examination of a key prosecution witness is restricted to avoid possible violation of the attorney-client privileges of the witness, then the defendant has major claims of ineffective assistance of counsel and lack of a fair trial. If the examination is not restricted, then the witness' attorney-client privilege may be violated. It is a significant public policy that individuals be free to disclose confidential information to their attorneys without fear of subsequent examination on and disclosure of those communications. The judge has a duty to maintain the integrity of the administration of the justice system." 245 Kan. at 562.

The court concluded the district court did not abuse its discretion in finding a conflict and disqualifying counsel. The court further concluded that, under Rule 1.10 of the Model Rules of Professional Conduct, the district court could have found Hoang's defense counsel had imputed knowledge of any confidential information relayed by the witness to his public defender. 245 Kan. at 566; see 2001 Kan. Ct. R. Annot. 365.

In *Jenkins*, the defendant argued he was denied effective assistance of counsel because defense counsel had represented the key prosecution witness on unrelated charges. The Kansas Supreme Court relied on *Holloway* and *Hoang* and held:

"[W]here the trial court is advised of the possibility of a conflict by either the defendant or the State, the court is required to initiate an inquiry to insure that the defendant's Sixth Amendment right to counsel is not violated. In this instance, a showing that there is an actual conflict of interest will result in automatic reversal." 257 Kan. at 1084.

Because the district court was aware of the conflict but failed to inquire further, Jenkins' conviction was reversed and his case remanded for new trial.

This case is distinguishable. Here, defense counsel represented an adverse prosecution witness and Sweat on separate cases but at the same time they were sharing a jail cell. Raine's testimony against Sweat had nothing to do with Raine's separate case. Defense counsel properly brought the simultaneous representation to the attention of the district judge, and the district judge properly gave counsel an opportunity to explain the nature of any conflict. Defense counsel did not articulate any actual conflict of interest that would prevent him from representing Sweat to the best of his ability. The fact that Raine had no fondness for her former lawyer, as counsel's remarks and her eventual testimony demonstrated, did not necessitate either disqualification of counsel or exclusion of Raine's evidence against Sweat. There was no abuse of discretion on the part of the district court.

### Admission of Photograph of Victim's Injuries

During Eddens' testimony, the prosecution admitted a photograph of him taken at the hospital, which showed Eddens' intes-

tines outside of his abdomen. Defense counsel's objection to the admission of the photograph was overruled. Sweat argues that the ruling on this objection was an abuse of the district court's discretion. See *State v. Gholston,* 272 Kan. 601, Syl. ¶ 2, 35 P.3d 868 (2001) (in determining whether photograph should be admitted, district court must determine relevance, existence of proper foundation; district court has broad discretion). In her view, the photograph was shocking, revolting, and prejudicial; and its probative value was limited because no testimony accompanied its presentation to the jury.

In *Gholston,* the Kansas Supreme Court noted that photographs that illustrate the nature or extent of wounds inflicted can be admissible when they corroborate the testimony of witnesses or are relevant. Photographs that prove the elements of the crime, including the fact and manner of a death or the violent nature of the crime, are relevant and admissible. 272 Kan. at 613.

Recently the Kansas Supreme Court said: "Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. Nevertheless, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue." *State v. Kirby,* 272 Kan. 1170, Syl. ¶ 9, 39 P.3d 1 (2002.)

It is true that the photograph of Eddens admitted in this case was gruesome and the manner in which the injury was inflicted was not in dispute, but the photograph corroborated both the responding officer's description of Eddens' injuries and Eddens' own testimony without being unduly repetitive. The photograph tended to support the attempted first-degree murder charge. The district court did not abuse its discretion by admitting the photograph into evidence.

*Testimony About Codefendant's Violent Behavior and Statements*

Sweat's son, Marcus Hill, testified at her trial. When defense counsel asked Hill "what type of person" Fierro was, the prosecutor objected on relevance grounds. The defense proffered testimony that Fierro was a violent person—always getting into fights;

harming animals; and talking about guns, shooting people, and getting into the Mafia. Hill also said he had seen Fierro selling guns.

The district court disallowed the testimony:

"Specific instances of conduct are not allowable to try to determine conduct on a specific occasion. So, if that's what you're pointing at. Of course, Mr. Fierro has admitted to being the one who carried the gun, who shot the victim in this case and I don't think it, his testimony bears on this case. I don't think it's relevant. I don't think it's admissible as relating to his reputation in the community."

We review the district court's refusal to admit this evidence under an abuse of discretion standard. See *State v. Matson,* 260 Kan. 366, 378-79, 921 P.2d 790 (1996).

Sweat contends her son should have been permitted to testify under K.S.A. 60-446, K.S.A. 60-447, and *State v. Blackburn,* 251 Kan. 787, Syl. ¶ 2, 840 P.2d 497 (1992).

K.S.A. 60-446 provides: "When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447 and 60-448."

K.S.A. 60-447 provides:

"Subject to K.S.A. 60-448, when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible, and (b) in a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence of the offense charged, (i) may not be excluded by the judge under K.S.A. 60-445 if offered by the accused to prove innocence, and (ii) if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character."

The threshold question that must be answered before these statutes come into play is: Was Fierro's character or a trait of his character in issue? The answer is no. Other than his tendency to be truthful or untruthful, neither Fierro's character nor any particular trait of his character was placed in issue by his or any other testimony. In *Blackburn,* the witness in question was the defendant, and he placed his violent propensity or lack thereof in issue by

denying that he would ever engage in the type of conduct alleged. Fierro did not deny that he shot Eddens and caused grievous injury. He admitted this act of dramatic violence from the beginning. The district court did not abuse its discretion in denying admission of Hill's testimony to prove Fierro's violent nature under 60-446, 60-447, or *Blackburn.*

On this issue, the State also argues K.S.A. 60-422(c) made Hill's testimony inadmissible.

K.S.A. 60-422 provides in relevant part:

"As affecting the credibility of a witness . . . (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

The State is correct that, to the extent Sweat was attempting to call Fierro's credibility into question with Hill's testimony, 60-422(c) and (d) supported the district court's ruling. The Kansas Supreme Court has held that K.S.A. 60-422(c) and (d) limit the proof of character traits of dishonesty and lack of veracity to opinion testimony and evidence of reputation permitted by K.S.A. 60-446. See *State v. Smallwood,* 223 Kan. 320, 326, 574 P.2d 1361 (1978). The proffered testimony included both specific instances of conduct Hill had observed and general testimony about Fierro's violent character. None of this proffered testimony was relevant to Fierro's honesty or veracity. Again, to the extent the district court may have relied upon 60-422(c) or (d) to exclude Hill's testimony, there was no abuse of discretion.

### Ineffective Assistance of Counsel

Before she was sentenced, Sweat submitted a written statement to the court, alleging she had received ineffective assistance of counsel. The statement read in pertinent part:

"There were no circumstances that led up to the offense. I do feel I have been wrongfully accused of the conspiracy charge. I feel I had inadequate representation and would like to appeal my case.

. . . .

". . . There is *a lot* of evidence that didn't come up in Court that should have. . . . I feel my trial was rushed . . . . My trial was less than a week from start to finish and a lot of evidence was not submitted by either side. Also there

were phone records I was waiting on, in which I told my attorney but he never mentioned them. I feel I had inadequate, and insufficient representation."

In response to these vague complaints, the district court found "that counsel was certainly adequate at trial, if not more than adequate."

Since she took this appeal, Sweat has sought a remand for an evidentiary hearing on this issue, but her request focused upon her argument that her counsel had a conflict of interest because of his representation of Raine. Having disposed of that issue adversely to Sweat above, no remand for an evidentiary hearing is necessary.

### Sentencing Disparity

Sweat's last issue on appeal focuses on the difference between her sentence and that given to Fierro.

Sweat's criminal history score was E. The district court sentenced Sweat to 234 months for attempted first-degree murder, 117 months for conspiracy to commit first-degree murder, and 32 months for aggravated burglary, all to run *consecutively*. Fierro's criminal history score was G. He was sentenced to 195 months for attempted first-degree murder, 117 months for conspiracy to commit first-degree murder, and 32 months for aggravated burglary, all to run *concurrently*.

The district court had this to say at the time:

"Miss Sweat, I sat through this entire trial. I also took the plea from Mr. Fierro and I've been privy to the information that the police had in this matter by way of the case and by way of the plea of the co-defendant in this case. And it's clear to this court, and I think it's clear to anyone who listened to the evidence in this case, that you were the one who planned this and that you were the perpetrator of this action, for whatever reason, to get even with Mr. Eddens. I don't think we ever understood that relationship that existed between the two of you. I don't think we know what the truth of that matter is. But we know that the truth of the matter is, as far as the jury saw it and as far as those who sat in this courtroom and listened to testimony, and especially your testimony, that Mr. Eddens is a very lucky person to be alive.

"It has always been this court's position that someone who plans and takes the life of another person—and I have expressed this publicly before—if someone plans and kills another person that they perhaps forfeit their right to live. And that has been my position on the death penalty.

"In this particular case you planned to kill somebody and you took steps towards that, and fortunately this person did not die. You've taken away from his life. We—I can't say how much of Mr. Edden's life has been taken away from him. I do know that because of your prior criminal history and the fact that you stand before this court today with a criminal history of E, which elevates the sentence that the court has to give you, your sentence in this case is going to be substantial. And you're a 36 year old woman who as a result of your actions today and as a result of the actions that you've taken with another person and to bring an 18 year old boy into a scheme to kill somebody who's a, by testimony of everybody, the best friend of your son, is something that needs to be severely punished. And anyone out there who thinks that you can go around and try to draw up a scheme to kill somebody simply because you have a disagreement with them, whatever that disagreement may be, needs to know that those acts do not go unpunished."

Sweat argues the district court did not provide adequate reasons on the record for the disparity in sentences and that her culpability relative to Fierro was the same.

"Generally, disparity in the sentences of codefendants does not amount to abuse of discretion where the trial court considers the individual characteristics of the defendant being sentenced, the harm caused by that defendant, and the prior criminal conduct of that defendant." *State v. Smith*, 254 Kan. 144, Syl. ¶ 4, 864 P.2d 709 (1993).

"A trial judge is not bound to sentence a defendant to a term equal to or shorter than the sentence given his or her codefendant. When a defendant receives a longer sentence than his or her codefendant, and reasons therefor appear in the record, the sentence imposed will be tested on appeal against a standard of abuse of discretion." 254 Kan. 144, Syl. ¶ 5.

Both Sweat and Fierro were given the standard sentences in the grid boxes for their convictions. The major difference in their controlling terms arose out of the district court's decision to sentence Sweat consecutively and Fierro concurrently. Sweat's controlling term is 383 months, while Fierro's controlling term is 195 months. If Sweat's sentences also had been imposed concurrently, she would have a controlling term of 234 months.

Sweat relies primarily upon *State v. Bailey*, 251 Kan. 527, 834 P.2d 1353 (1992), in which two defendants were convicted of the same crimes and given identical sentences; however, one was to serve the sentences consecutively and the other concurrently. This meant one defendant had to serve 45 years before becoming eligible for parole, while the other had to serve 30 years.

The sentencing court summarily dismissed an argument based on the wide difference in parole eligibility by finding the codefendant's sentence irrelevant. The Kansas Supreme Court held the district court abused its discretion by not considering the disparity and ruled the district court must state its reason on the record for imposing a longer sentence on one defendant. 251 Kan. at 531.

*Bailey* does not control here. Although the district court did not specifically compare Sweat's and Fierro's sentences, it noted its involvement in accepting Fierro's plea and articulated its reasons for imposing Sweat's terms of imprisonment. The district court specifically mentioned that Sweat had planned Eddens' murder and that she had engaged in her behavior because she wanted to get even with the victim. The court also noted that her sentence would be elevated because of her criminal history and said she needed to be "severely punished" because she convinced her son's 18-year-old friend to help her. The evidence presented clearly supported these statements by the district court, and these statements constituted an adequate on-the-record rationale for the sentencing difference. The district court did not abuse its discretion.

Affirmed in part and reversed in part.