(122 P.3d 408)
No. 92,207

STATE OF KANSAS, *Appellee*, v. MARK A. HANKERSON, JR.,
*Appellant*.

Opinion filed November 10, 2005.

*Sarah Ellen Johnson*, assistant appellate defender, for the appellant.

*Kristi L. Barton*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Phill Kline*, attorney general, for the appellee.

Before PIERRON, P.J., CAPLINGER, J., and BUKATY, S.J.

BUKATY, J.: Mark A. Hankerson appeals his convictions by a jury and his subsequent sentencing on one count each of aggravated burglary and kidnapping and three counts of attempted first-degree murder. He raises four issues: multiplicity as to two of the three attempted murder charges, insufficient evidence, prosecutorial misconduct, and error in calculating his criminal history score. We affirm.

All the charges arose out of a pursuit of Hankerson by Wichita police and his attempt to get away. A somewhat detailed recitation of the facts is necessary for an understanding of the issues on appeal.

After a short car chase for reasons not material to the issues on appeal, Hankerson, wielding a gun, exited the car he was driving and proceeded on foot. Officer Sawyer and Sergeant Nedbalek exited their squad cars and ran after Hankerson until he jumped onto the porch of a house where Courtney Judge lived. Judge was standing on her porch next to the front door when Hankerson arrived. Hankerson then pointed his gun at Nedbalek and Sawyer

and fired several rounds at the officers. He approached Judge and forced her into the house. The officers testified that Hankerson grabbed Judge in a headlock, pointed the gun at her, and took her into the house. Judge stated that Hankerson entered her house through an open screen door and then ordered her to "get inside or he was going to shoot me" when he was already "inside the door."

Once Judge was inside the front door with Hankerson, he stood behind her with his gun in her back. As the police called Hankerson to come out and give up, he looked around the house to make sure Judge was alone. Judge was crying and asking Hankerson not to shoot her, but she eventually struck up a conversation with him. She asked why the police were after him, and Hankerson replied that he believed the reason was that he had robbed a store. Judge asked why he did not just give up, and Hankerson answered that "he would rather die than go back to jail." Hankerson asked Judge to call his brother and tell him he was sorry, and he wrote down the number for Judge on an envelope she had in her purse nearby. He repeatedly asked Judge to make sure she called his brother, and Judge said she would.

After 20 or 25 minutes, Hankerson looked outside and saw the police were still there and asking him to come out and let Judge go. He decided to exit the house, and instructed Judge that "we were going to walk out and he was going to — when we walk outside and when we get to the sidewalk, he was going to count to 3 and let me go and just to run." Pointing his gun in Judge's back and holding her in a headlock, Hankerson walked out of the house and down the porch stairs. While walking, he told Judge that he would rather the police kill him than simply wound him. He asked her if the car in the driveway was hers, and Judge replied it was.

At this time, the police and Hankerson were yelling back and forth. The officers were urging Hankerson to release Judge, and Hankerson demanded that they call his brother and mother, and used obscenities. When Hankerson and Judge reached Judge's car, he asked her to open up the driver's side door, and she did so. Hankerson leaned against the open car door, still holding Judge in front of him and pointing his gun in her back. At some point, he

expressed to her his concern that if he put his gun down, the police would shoot him. Hankerson apparently believed he saw a sniper and pulled Judge closer to him.

Finally, Hankerson counted to three in Judge's ear and let her run away. He then raised his gun, pointed it at Sergeant Nedbalek, and fired several rounds. The police returned fire and critically wounded Hankerson.

Obviously, Hankerson survived and the State filed the charges for which he was convicted. He received a controlling term of 352 months in prison.

Hankerson first argues the two attempted murder convictions involving Officer Nedbalek are multiplicitous because they arise out of the same act of violence. Not surprisingly, the State contends the two series of shots fired at Nedbalek were two separate incidents not arising out of the same act of violence and not multiplicitous.

Whether convictions are multiplicitous is a question of law subject to unlimited review. *State v. Stevens*, 278 Kan. 441, 446, 101 P.3d 1190 (2004).

"Multiplicity is the charging of two or more counts in a complaint where only a single wrongful act is involved. [Citation omitted.] The harm of multiplicity is that it creates the potential for multiple punishments for a single offense." 278 Kan. at 446. Offenses are not multiplicitous if they are committed separately and severally at different times and in different places, " ' "because they cannot then be said to arise out of a single wrongful act." ' " *State v. Warren*, 252 Kan. 169, 175-76, 843 P.2d 224 (1992); see *State v. Groves*, 278 Kan. 302, 306, 95 P.3d 95 (2004); *State v. Kessler*, 276 Kan. 202, 206, 73 P.3d 761 (2003).

Hankerson did not raise this issue with the trial court. Normally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the court for review. *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003). However, one may raise an issue on appeal for the first time in order to serve the ends of justice and prevent a denial of the fundamental right to a fair trial. See *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 (1984). We will address the multiplicity issue on that basis.

Hankerson argues the two times he shot in the direction of Nedbalek were part of a single wrongful act and cites *State v. Fulton*, 28 Kan. App. 2d 815, 23 P.3d 167 (2001), in support. The brief extent of *Fulton's* discussion of multiplicity is as follows:

"Maurice testified that Fulton told him, 'We're going to make you give us money,' and then Fulton took a knife and cut the side of Maurice's face. When Maurice replied that he did not have any more money, Fulton used the same knife and cut or 'carved' Jones' chest. This constituted one continuous incident, not two multiple acts. If the cutting on the two parts of Maurice['s] body had been charged separately, one charge would [have] been subject to dismissal as multiplicitous. [Citation omitted.]" 28 Kan. App. 2d at 822-23.

Clearly, *Fulton* dealt with two events which were so close in time and place as to be nearly simultaneous. It is in line with other case law that has held a defendant could not be charged with both attempted murder and aggravated battery because the underlying act or acts of violence occurred simultaneously or at "approximately the same time and place." See, *e.g.*, *State v. Perry*, 266 Kan. 224, 230, 968 P.2d 674 (1998); *State v. Cathey*, 241 Kan. 715, Syl. ¶ 2, 741 P.2d 738 (1987); *State v. Garnes*, 229 Kan. 368, 373-74, 624 P.2d 448 (1981).

In contrast, this case does not involve a single, continuous act. It involves several crimes that took place over at least a half an hour. Hankerson decided to fire rounds of shots in Nedbalek's direction two separate times and at two separate locations: first as he approached or was on Judge's porch, and again several minutes later when he was getting into Judge's car. The two acts did not occur simultaneously or at "approximately the same time and place." The second act occurred after a "break in the action" between Hankerson and the police. Between the two acts of shooting, Hankerson committed two more felonies, aggravated burglary and kidnapping. See *State v. Baker*, 255 Kan. 680, 683, 877 P.2d 946 (1994).

If nothing more had happened when Hankerson arrived at Judge's car, the events that occurred before he kidnapped Judge and entered her house would support a charge of attempted murder. Likewise, had Hankerson not fired in the direction of the officers before the kidnapping and entry into Judge's house, the

shots fired when he reached Judge's car would also support a charge of attempted murder. Each incident stands on its own. The two occasions where Hankerson fired shots in the direction of Nedbalek were "two acts of attempted second-degree murder [which] were committed separately and severally, at different times and at different places, and the charges may not be said to arise out of the same wrongful act." *State v. Smith*, 254 Kan. 144, 151, 864 P.2d 709 (1993). The charges are not multiplicitous.

Hankerson next argues the conviction for aggravated burglary is not supported by the evidence because the underlying felony of kidnapping Judge was completed before he entered into her house. The State responds that Hankerson entered into or remained inside Judge's house with the intent to kidnap her.

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Calvin*, 279 Kan. 193, 198, 105 P.3d 710 (2005).

This issue involves interpreting the elements of the crimes of aggravated burglary and kidnapping. "Interpretation of a statute is a question of law, and an appellate court's review is unlimited." *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003).

The State charged Hankerson with aggravated burglary for his unauthorized entry into Judge's house "with the intent to commit a felony, to-wit: Kidnapping, therein." K.S.A. 21-3716 defines aggravated burglary as "knowingly and without authority entering into or remaining within any building, manufactured home, mobile home, tent or other structure . . . in which there is a human being, with intent to commit a felony, theft or sexual battery therein."

Kidnapping is the taking or confining of any person, accomplished by force, threat, or deception, with the intent to hold such person for ransom, or as a shield or hostage. K.S.A. 21-3420(a).

Hankerson contends his kidnapping of Judge was completed before he entered her residence and therefore the charge of aggravated burglary has no underlying felony and his conviction thereon should be reversed. This point has no merit.

Whether Hankerson grabbed Judge on the porch (as the officers testified) or ordered her to join him inside the house after threatening her (as Judge testified), he forced her into the house at gunpoint. He remained with her there for 20 to 25 minutes and discussed, among other things, his plan to exit the house using her as a human shield. The evidence clearly shows Hankerson entered into and remained inside Judge's home intending to "confine" her and hold her as a shield or hostage; in other words, to kidnap her. After review of all the evidence, viewed in a light most favorable to the prosecution, a rational factfinder certainly could have found Hankerson guilty of aggravated burglary beyond a reasonable doubt.

Hankerson next alleges the State engaged in prosecutorial misconduct when it commented on his guilt during closing arguments. The State responds that the prosecutor's comments were not opinions, but mere suggestions of what the jury should find based on the evidence.

" 'A two-step analysis is applied to allegation of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error; that is, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby requiring reversal. The facts of each case must be scrutinized in determining whether a prosecutor's remarks deny the defendant a fair trial. If the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs without regard to a contemporaneous objection. [Citation omitted.]' " *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005).

The relevant portion of the prosecutor's closing statement is repeated below, with the alleged improper comments emphasized:

"Now, you're given an instruction that attempted first-degree murder includes that lesser included offense of second-degree murder. And it most certainly does. Because as the State proves Mr. Hankerson guilty of first-degree murder, it—the State necessarily proves him guilty of first, the State necessarily proves him guilty of second because the only difference between first-and second-degree murder is the lack of premeditation in second degree.

"And the State submits to you that after reviewing all the evidence and using your reasonable judgment and your common sense you stop right there because *Mr. Hankerson is guilty of attempted first-degree murder* and nothing less. It just

happens that as you prove first degree, you necessarily prove second degree. So stop when you consider the evidence and apply the law to that evidence. *And stop at attempted first-degree murder because that is what most certainly he is guilty of.* Because again, premeditation does not require any specific time period. And again, as we talked about in jury selection, this is not TV." (Emphasis added.)

"[T]he Kansas Rules of Professional Conduct (KRPC) unequivocally state that an attorney shall not state a personal opinion as to the credibility of a witness or as to the guilt or innocence of the accused. KRPC 3.4 (2002 Kan. Ct. R. Annot. 416) (fairness to opposing party and counsel)." *State v. McHenry*, 276 Kan 513, 524, 78 P.3d 403 (2003).

In *McHenry*, "the prosecutor's comment expressing a personal opinion regarding guilt was a single comment in the midst of a summary of the evidence which the prosecutor argued should lead the jury to find the defendant guilty." 276 Kan. at 525. The Kansas Supreme Court held: "The comments in this case crossed the line of fair comment but, given the context, were not gross or flagrant." 276 Kan. at 525. Further, *McHenry* found there was no indication of ill will by the prosecutor, and the comments likely had little weight in the minds of the jurors in view of the overwhelming evidence against the defendant. 276 Kan. at 525-26.

This case is similar to *McHenry*, as the prosecutor's two statements emphasized above crossed the line of fair comment and are outside the wide latitude allowed in discussing the evidence. As in *McHenry*, however, the comments were "in the midst of a summary of the evidence which the prosecutor argued should lead the jury to find the defendant guilty." The improper comments were not so gross or flagrant to deny Hankerson a fair trial. Nor do the comments display ill will or bad faith. Finally, the evidence on premeditation was of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. The State's evidence was uniform that on two separate occasions during his attempted flight from police, Hankerson pointed his gun at the officers and fired several rounds. The prosecutor's comments do not require reversal.

In his final point on appeal, Hankerson claims that the inclusion of his prior convictions in his criminal history, without presentation

to a jury, impermissibly increased his maximum penalty in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

This issue is well settled adversely to Hankerson's position. See *State v. Pennington*, 276 Kan. 841, 851, 80 P.3d 44 (2003); *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002). We find nothing improper about Hankerson's criminal history calculation and the sentence based upon it.

Affirmed.