NOT DESIGNATED FOR PUBLICATION

No. 115,223

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL LYNN CREGUT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed June 30, 2017. Affirmed in part and reversed in part.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., GREEN and BUSER, JJ.

*Per Curiam*:  Daniel L. Cregut was convicted by a jury of one count of attempted murder in the first degree; two counts of attempted murder in the second degree; three counts of aggravated assault with a deadly weapon; two counts of aggravated burglary; one count of aggravated criminal threat; one count of criminal threat; one count of kidnapping; one count of stalking; one count for violation of a protective order; and one count of criminal damage to property. These convictions resulted from Cregut's kidnapping of his ex-girlfriend, Julia Wilson, in Topeka, Kansas. Cregut appeals, arguing (1) that the trial court erred in denying his request for a unanimity jury instruction on the

1

charge of the attempted murder of Wilson; (2) that the trial court erred in admitting audio from 911 calls; (3) that there was insufficient evidence to support his conviction for aggravated criminal threat; and (4) that there was insufficient evidence to support his conviction for aggravated burglary. Of these four issues, we conclude that only the third issue requires reversal. Accordingly, we affirm in part and reverse in part.

Around May 2012, Wilson and Cregut began dating. In March 2014, Wilson ended her relationship with Cregut. After the breakup, Wilson and Cregut continued to communicate and had what Wilson described as "an on and off thing." But on June 21, 2014, Wilson obtained a protection from abuse order against Cregut. Cregut was ordered not to have any contact with Wilson.

On June 29, 2014, Cregut went to Wilson's apartment in Topeka, Kansas. While at the apartment, Cregut and Wilson got into an argument. Wilson left her apartment that night and stayed with a friend in Lawrence, Kansas. On June 30, 2014, Wilson returned to her apartment between 10 a.m. and 11 a.m. When she got into the building, she saw Cregut waiting for her in the hallway. Cregut did not have keys to the building—he later told police that he used a ladder to gain access to the building by climbing through the window in Wilson's apartment.

When Wilson approached Cregut, he pointed a gun at her and ordered her into her apartment. Cregut told Wilson that he would shoot her if she did not do as he said. Wilson complied and they entered her apartment. Cregut was upset that Wilson had not returned to her apartment the night before. While inside the apartment, Cregut and Wilson talked about their past relationship and what had gone wrong. Cregut told Wilson that he was upset that the relationship had ended.

When Wilson tried to leave the apartment, Cregut pointed the gun at her. Wilson stated that she knew that if she tried to leave, Cregut would use the gun. When Wilson

2

turned on the air conditioning in the apartment, Cregut told her not worry about running up the bill because she would not be around to pay it. Sometime later, Cregut and Wilson ran out of cigarettes. Cregut told Wilson that they would go together to get more cigarettes.

Cregut took his gun with him and drove to a smoke shop on Huntoon Street. Wilson rode in the front passenger seat. Cregut told Wilson that he would shoot her if she did not stay by his side. When Wilson and Cregut arrived at the smoke shop, they both got out of the car. When Wilson got out of the car, she pretended as though she was going to walk into the smoke shop. Instead, Wilson ran toward the BP gas station (BP) across the street. Wilson stated that she ran from the car because she was scared for her life. She thought if she ran to the BP, someone may be able to help her. Cregut followed Wilson toward the BP.

On June 30, 2014, Bryon Snyder stopped at the BP on his lunch break to buy a drink. As Snyder walked into the BP, he heard Wilson screaming for help and saw her running toward the store's entrance. Snyder said Wilson was repeating, "he's got a gun, he's going to kill me, help." Snyder told Wilson to go inside and hide. Snyder went inside the BP and stood in front of the door. He saw Cregut approaching. Donald Hajek, the manager of the BP, called 911. Snyder applied pressure to the door in an attempt to keep Cregut from entering the store. Wilson ran to a back room in the store and closed the door behind her.

Hajek went to the door that Snyder was holding shut to see if anyone was coming toward the store. He saw Cregut approaching. Cregut walked up to the door and yelled at Snyder to let him in. When Cregut tried to push the door open, Snyder held it closed and told Cregut to leave. Cregut then took his gun out of his pocket. Hajek turned and ran for the "cage," which is the area behind the counter surrounded by bulletproof glass. As Hajek ran for the cage, Cregut aimed his gun at Snyder's chest and shot him through the

3

door. Snyder and Hajek later testified that after Cregut pulled his gun out of his pocket, Cregut looked at Snyder and smiled before he shot him. Cregut's bullet went through the door, through Snyder's hand, and into Snyder's chest in two places. Snyder fell to the ground, and Cregut entered the store. Cregut was screaming, "Where's she at?"

Just as Hajek reached the cage and locked himself in, Cregut fired a shot in Hajek's direction. Thomas Whisler, a lottery machine technician, was also in the cage with Hajek. At that point, Hajek told the 911 operator that shots had been fired. Cregut looked around the store for Wilson. He circled back to the front of the store. Cregut then took aim at Hajek's chest behind the bulletproof glass and fired his gun. The bulletproof glass stopped the bullet. Hajek testified that Cregut "was out to kill" and that he looked as though "he was hunting somebody." Cregut circled the store once again looking for Wilson.

After Cregut circled the store for a second time, he returned to Snyder. Cregut pointed the gun down at Snyder's face and threatened to kill him if he did not tell Cregut where Wilson was hiding. Snyder did not know exactly where Wilson was hiding, so he told Cregut that she had run out the back door. Snyder crawled out of the store and yelled for help. He saw Cregut walk out of the store and leave the scene. The entire sequence of events that happened at the BP was captured on surveillance cameras. As a result of his gunshot wound, Snyder had damage to his hand, heart, lung, and liver. His hand required surgery; his heart needed six stitches; his lung required surgery; and his liver had to be cauterized.

When the police located Cregut in a house in the 1200 block of S.W. Washburn Avenue, he would not surrender. Detective Kent Biggs of the Topeka Police Department was brought in to negotiate with Cregut. Biggs talked to Cregut on the phone. During their conversations, Cregut commented on what had happened. Cregut told Biggs the following:

"I broke into her fuckin' apartment and waited for her to come home. And . . . what else do you need? What else is there? We went to get cigarettes and then she got out of the car and took off running and I chased her to the fuckin' station and shot some motherfucker that was standing in the road. You can't do shit like that . . . . I need to be locked up . . . . Someone does that shit deserves to be locked up and I just don't want to be locked up, that's all."

Cregut also told Biggs that his intentions that day were to kill Wilson. Specifically, Cregut said, "I was trying to fuckin' kill her is what the fuck I was doing" and "if I could have found her, I would have killed her." Cregut ultimately surrendered to the police without issue.

Later, the police would interview Cregut. The interview was conducted by Detective Jeri Cole of the Topeka Police Department. During the interview Cregut acknowledged that he followed Wilson to the BP. Cregut said, "I think I just lost my mind . . . I think I've never been that mad before." Cregut told Cole that when Wilson ran away from him toward the gas station, it sent him "over the edge." He told Cole that he remembered Snyder holding the door closed. When Cole asked Cregut what happened next, Cregut said, "Obviously, I shot the guy." Cregut also acknowledged shooting at the cage. Cregut acknowledged that had Snyder not been there to slow him down, he was going to kill Wilson.

Cregut was charged in a 16-count complaint/information: He was charged with four counts of attempted murder in the first degree; four counts of aggravated assault with a deadly weapon; two counts of aggravated burglary; one count of aggravated criminal threat; one count of criminal threat; one count of kidnapping; one count of stalking; one count for violation of a protective order; and one count of criminal damage to property.

5

A jury later found Cregut guilty of the following 14 charges: one count of attempted murder in the first degree; two counts of attempted murder in the second degree; three counts of aggravated assault with a deadly weapon; two counts of aggravated burglary; one count of aggravated criminal threat; one count of criminal threat; one count of kidnapping; one count of stalking; one count for violation of a protective order; and one count of criminal damage to property.

After the jury verdict, Cregut moved for a judgment of acquittal challenging his convictions for aggravated criminal threat and violation of a protective order. In addition, he moved for a dispositional departure sentence. The trial court denied both of Cregut's posttrial motions.

Cregut was sentenced to a total controlling prison term of 308 months.

*Did the Trial Court Err in Denying Cregut's Request for a Unanimity Instruction on the Charge of Attempted First-degree Murder of Wilson?*

Cregut asked the trial judge for a unanimity instruction at his trial:

> "Judge, we're requesting an instruction on unanimity on what the overt act towards the perpetration of first-degree murder is on each of those attempted first-degree murder charges because there are several acts . . . that [the jury] could find . . . [in relation to] that Julia Wilson attempted murder. We're asking for an instruction that they must have a unanimous verdict on what that overt act was beyond a reasonable doubt."

Cregut initially limited his request for a unanimity instruction to the charge relating to Wilson, but he later amended his request to also ask for a unanimity instruction for the charge relating to Hajek. Interestingly, the State offered no objection to including a unanimity instruction in relation to the attempted first-degree murder of Hajek. The trial

court reserved the issue for argument as it related to the charge for attempted first-degree murder of Wilson.

The next day, the trial court heard arguments on the propriety of the unanimity instruction as it related to the count charging Cregut with the attempted first-degree murder of Wilson. The State offered the following argument:

> "Your Honor, I looked at - - there's not a lot of published authority I could find but *State v. Kleypas*, . . . 272 Kan. 894. State was reversed on other grounds, but in that case the Court - - the Kansas Supreme Court makes pretty clear that overt acts on attempt are not . . . alternative means and they are not multiple acts, therefore unanimity is not required by the jury like it would be in a conspiracy charge where the State would have to elect or identify the overt act that supports the conspiracy.

> "So, based on that case, even though it was overruled on other grounds . . . the State does think an instruction on multiple acts for the overt act on attempt would - - is not only not proper but I think it's a misstatement of the law."

The trial court responded to the State's brief argument:

> "And that's the research I found, too. *Kleypas* was a capital murder case. It was the first case in which they found that the - - well, it went to the capital punishment issue is what it did. But there's also *State v. Sweat* . . . and the *Sweat* case also identifies *Kleypas* for that same proposition.

> "*State v. Baker* is a case I pulled up. It's an unpublished case, but it cites both *Sweat* and *Kleypas* for that same proposition. I only bring that out because, although it's unpublished, it's on point and it references both those other cases. So based on those findings by *Kleypas* and *Sweat*, I'm going to deny the defendant's motion for a multiple acts instruction as to the overt act on Count 2 attempted murder dealing with Julia Wilson."

7

On appeal, Cregut argues that the trial court erred in denying his request for the unanimity instruction as it related to the count charging the attempted first-degree murder of Wilson. Specifically, Cregut argues that

> "the State presented evidence of multiple acts that could have been used to support two separate attempted murders. Specifically, the State presented evidence of two different incidents that could support a charge, when Mr. Cregut waited for Ms. Wilson at her apartment, and when he chased her into the BP station."

Thus, Cregut asserts that "jury unanimity was . . . required because the State presented evidence of multiple attempts."

The State responds, arguing that "the requested unanimity instruction was not legally appropriate because a unanimity instruction on multiple acts is not required for the overt act of an attempted crime." The State relies on the same authority that the trial court relied on in denying Cregut's request for the instruction. Additionally, the State argues that it did not present evidence of multiple acts at trial and that even if the unanimity instruction was appropriate, the error was harmless.

An appellate court reviewing a challenge to a jury instruction employs the following four-part analysis:

> """(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert.*

*denied* 132 S. Ct. 1594 (2012)."' [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

See K.S.A. 2016 Supp. 22-3414(3).

When an appellate court is faced with a challenged jury instruction based on unanimity and multiple acts, to determine whether the failure to give the instruction was erroneous the court first must consider (1) whether the case involves multiple acts; and (2) whether the trial court committed error. This is necessarily part of determining whether a proposed instruction would have been legally and factually appropriate. See *State v. Trujillo*, 296 Kan. 625, 631, 294 P.3d 281 (2013) (citing *State v. Voyles*, 284 Kan. 239, 160 P.3d 794 [2007]). Thus, we will proceed through our analysis under the framework set out in *Fisher*.

*Jurisdiction and Preservation*

Here, Cregut clearly requested the jury instruction that was denied by the trial court. Thus, Cregut successfully preserved the issue for consideration on appeal. As a result, the issue is properly before us.

*Whether the Instruction was Legally Appropriate*

The trial court cited to a specific line of cases for support of its finding that a unanimity instruction was not legally appropriate in this situation. Those cases include *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), and *State v. Sweat*, 30 Kan. App. 2d 756, 48 P.3d 8, *rev. denied* 274 Kan. 1118 (2002). These are the same cases relied on by the State on appeal.

In *Kleypas*, the defendant challenged his conviction for attempted rape by arguing that the jury instruction relating to the charge of attempted rape was given in error "because it failed to specify the overt act which supported the conviction." 272 Kan. at 941. The defendant further argued "that the jury was required to be unanimous on the overt act which supported the attempted rape and the court should have either required the State to elect an overt act or given a unanimity instruction." 272 Kan. at 941. Our Supreme Court rejected the defendant's argument, finding that

"the attempted rape charge at hand presents neither a multiple acts nor an alternative means situation. The possible overt acts need not themselves be illegal or chargeable as criminal offenses and, thus, this is not a multiple acts case. Nor are the overt acts alternative means of committing the offense. Rather, they are acts, however innocent in themselves, which signify and trigger liability for the offense of attempt. As such, there was no requirement that the jury be instructed as to a specific overt act. [Citation omitted.]" *Kleypas*, 272 Kan. at 942.

The State also asks this court to consider *Sweat.* In *Sweat*, the defendant challenged her conviction for attempted first-degree murder by arguing that "the State's presentation of evidence of multiple overt acts towards the perpetration of the crime of first-degree murder" meant that there was "a real possibility that jurors might not be unanimous on the particular overt act." 30 Kan. App. 2d at 762. The court rejected the defendant's argument, relying on *Kleypas*. The court held that "[a]pplying *Kleypas* to this case, the failure to specify a single overt act for the jury to rely upon on the attempt charge did not create a multiple acts problem." *Sweat*, 30 Kan. App. 2d at 762.

Cregut argues, though, that *Kleypas* and *Sweat* are distinguishable from his appeal because they involved a situation "where multiple overt acts . . . go to a single attempt," and his case involves "multiple factually separate attempts." Cregut cites to *State v. Baker*, No. 99,353, 2010 WL 2216738 (Kan. App. 2010) (unpublished opinion), in arguing that "this Court has noted a distinction between multiple overt acts supporting a

10

single attempt, where unanimity is not required, and multiple attempts, where unanimity is required." Interestingly, the State offers *Baker* as support for its argument that a unanimity instruction was not legally appropriate. Thus, a brief discussion of *Baker* is necessary.

In *Baker*, the defendant was charged and convicted with attempted manufacture of methamphetamine after multiple component parts required for making the drug were found in his car. The defendant challenged his conviction for attempted manufacture of methamphetamine by arguing that "the overt acts relied upon by the State to support the charge . . . constituted multiple acts to commit the crime requiring a unanimous jury verdict for each overt act." 2010 WL 2216738, at *2. This court rejected the defendant's arguments. First, the court analyzed *Kleypas* and *Sweat*, finding that "[i]f the failure to specify overt acts in an attempt charge does not create a multiple acts problem, it follows that the district court is not required to give a unanimity instruction when the defendant is charged with committing an attempted crime." 2010 WL 2216738, at *3. Finally, the court held:

> "Kansas case law does not support [the] position that the State must identify a single
> overt act or that the possession of multiple items for the same purpose constitutes
> multiple distinct acts. Had the evidence showed that [the defendant] was attempting to
> manufacture methamphetamine in the car and also at his residence, then a multiple acts
> situation might have existed warranting a unanimity instruction to the jury. However, this
> was not the evidence. Because [the defendant's] argument does not satisfy the threshold
> inquiry for finding a multiple acts problem, we conclude the district court did not err by
> failing to give the unanimity instruction." 2010 WL 2213768, at *4.

Thus, the State relies on *Baker* and specifically offers the part of the opinion that states, "[i]f the failure to specify overt acts in an attempt charge does not create a multiple acts problem, it follows that the district court is not required to give a unanimity instruction when the defendant is charged with committing an attempted crime." But

11

Cregut offers *Baker* for a different purpose. He specifically references the part of the opinion discussing that a unanimity instruction may have been appropriate had two separate attempts to manufacture methamphetamine occurred—one in the car and one at the defendant's residence.

Again, Cregut argues that this court is faced with the type of hypothetical situation mentioned in *Baker*'s holding—two separate attempts, one at Wilson's apartment and one at the BP. This type of unanimity instruction—multiple acts supporting separate attempts—has already been implicitly recognized by the State in Cregut's case. As was mentioned before, Cregut requested a unanimity instruction for the charge of attempted first-degree murder of Hajek. He argued to the trial court that Cregut had shot in Hajek's direction two separate times and that either shot could have been an overt act for the purpose of his attempted first-degree murder. The State did not challenge the unanimity instruction for the charge of attempted first-degree murder of Hajek. Therefore, the State has recognized that a unanimity instruction can be appropriate when multiple overt acts support factually separate and distinct attempts.

The State actually argues in its brief the fact that it agreed to unanimity instructions being given for other charges supports its contention that "had there been evidence to support two attempted murder charges of Wilson, the State would have included a unanimity instruction on this crime as well." Thus, the State asserts that there were not multiple acts that could have supported two separate attempts on Wilson's life. Accordingly, the State argues that because the evidence does not support two separate attempts, the unanimity instruction was not legally appropriate under *Kleypas*, *Sweat*, and *Baker*.

Consequently, our threshold question is whether we are faced with a multiple acts case. We must determine—is Cregut correct that the State's evidence supports two

separate attempts on Wilson's life? Or is the State correct that it only offered evidence supporting one attempt on Wilson's life?

An appellate court exercises unlimited review in considering whether a case presents a multiple acts issue. *State v. King*, 299 Kan. 372, 379, 323 P.3d 1277 (2014).

"When multiple acts jury unanimity is an issue on appeal, the threshold question is whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. [Citation omitted.] . . . [A]cts are multiple acts if they are factually separate and distinct. And incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a later criminal act is motivated by a 'fresh impulse.' [Citation omitted.] Factually separate and distinct incidents are not what this court calls 'unitary conduct.' [Citation omitted.] The factors we have used to determine the existence of unitary conduct are: '"(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." [Citations omitted.]'" *King*, 299 Kan. at 379.

The State argues that it "presented evidence of one ongoing act, starting at Wilson's apartment and ending at the BP . . . gas station." The State further argues that

"[t]he evidence did not show that Cregut attempted to kill Wilson in her apartment and also attempted to kill her at the BP gas station. The attempt to kill Wilson was at the BP gas station and the fact that there were multiple overt acts toward the perpetration of that attempted crime does not make it a multiple acts case."

The State asserts that the prosecutor made it clear to the jury that the attempted murder occurred at the gas station.

13

Cregut, on the other hand, argues that the State presented evidence of two separate attempts on Wilson's life—one at her apartment and one at the BP. He argues that "the events at the apartment were factually separate and sufficient to support a separate charge of attempted murder." He then argues that "[b]ecause the events at the BP station occurred at a separate location and were motivated by a fresh impulse, they constitute multiple acts and a unanimity instruction was required."

Both parties focus on the State's closing argument at Cregut's trial as the basis for their arguments on appeal. This court has looked to closing arguments before to determine whether the State presented evidence supporting a unanimity instruction. See *Baker*, 2010 WL 2216738, at *3. Thus, we will examine the State's closing argument for an indication as to whether a unanimity instruction was appropriate in this case.

First, we begin with the State's opening remarks at its closing argument. The prosecutor focused on the BP station:

> "I was trying to kill my girlfriend. I was trying to kill her. I would have killed her if I could have found her. Those are the defendant's statements to Detective Biggs when he was inside 1270 Southwest Washburn after he shot Bryon Snyder and *after he tried to kill . . . Julia Wilson at the BP station*.

> "Later he tells Detective Cole - - he agrees with Detective Cole when Detective Cole says, if that guy wouldn't have stopped you, you would have killed her, wouldn't you. Yeah, I would have.

> "He went from mad to wanting to kill her. Those are his words. At what point did you go from being mad to deciding to kill her? *When she ran*. In his own words. *When she ran*." (Emphasis added.)

The State's opening remarks make it quite clear that it was arguing that Cregut attempted to murder Wilson at the BP. In fact, the State plainly states that "he tried to kill

14

. . . Wilson at the BP station." It is also clear that the State is arguing that Cregut developed the intent to kill Wilson when she ran into the BP. These opening remarks support the State's argument on appeal that it was not arguing two separate attempts.

Next, the State specifically addressed the charge of attempted first-degree murder of Wilson at closing. The State addressed some of the counts that it deemed "easy ones" before it got to the attempted murder of Wilson. The State moved on, telling the jury that "[n]ow, that takes us to the BP gas station. The defendant is charged with four counts of attempted first degree murder." This statement is further indication that the State was arguing that the attempted murder occurred at the BP.

The prosecutor then went on to compare Cregut's actions to an individual who was hunting prey. The prosecutor developed this analogy as a result of Hajek testifying at trial that Cregut looked as though he was hunting somebody. The prosecutor continued his closing:

> "What acts did he take towards trying to kill Julia Wilson because . . . we have to prove an overt act. An overt act is more than mere preparation. It's an act either the first or a subsequent act towards the act of killing. The first or a subsequent act towards that. More than preparation. It's going back to the hunting analogy. Getting your license. Obtaining a firearm. Obtaining ammunition. That's all preparation. But when you actually load that firearm, put it in your car, take it to your tree stand, climb up in that tree stand, sit there and wait. That's more than preparation. Those are steps towards killing that animal.

> "In this case, each one of those steps defendant took at her apartment, getting the ladder, taking it there, breaking in, taking his firearm, having it loaded, taking the firearm out of the holster. . . . These are all acts that he took towards ultimately trying to kill her.

> "Then when he gets to the smoke shop and she runs, there are more acts. He chases her. He meets resistance at the door. He takes action to overcome that resistance,

15

and then you see him searching that BP, checking the doors, checking the rooms. These are all acts towards killing Julia Wilson. This isn't mere preparation. These are overt acts towards the commission of that crime.

"And this was premeditated. I was trying to kill my girlfriend. I was trying to kill her. I would have killed her if I would have found her. He agreed with Detective Cole, he would have killed her if they wouldn't have got in his way. *The decision to kill her was made when she ran*. Someone needed to stop her. This was a plan that he was carrying out by his actions." (Emphasis added.)

Within these remarks we once again see the emphasis on the fact that Cregut decided to kill Wilson when she ran away from him at the smoke shop. Certainly, as Cregut argues, the prosecutor told the jury that some of Cregut's actions at the apartment could be viewed as overt acts toward the commission of Wilson's murder. Even so, the prosecutor's arguments make clear that the actual attempt on Wilson's life occurred at the BP. The prosecutor's arguments do not support Cregut's assertion that two separate attempts occurred. Instead, the prosecutor's arguments show that Cregut was taking continuous steps toward the commission of Wilson's murder that culminated in an attempt at the BP. This conclusion is further supported by the prosecutor's following comments:

"The evidence shows this defendant knew exactly what he was doing. He was carrying out his plan and he took steps and committed acts in furtherance of that plan, and that plan changed as he went along, but it was a plan nonetheless and he acted on it intentionally. For that reason, the State's asking you to find the defendant guilty of every count that we have charged."

The prosecutor did not argue that overt acts occurred at Wilson's apartment that supported a charge of attempted murder at that location and also that overt acts occurred at the BP that also supported a charge of attempted murder at that location. Instead, the prosecutor argued that overt acts occurred throughout the day that led to the attempted

16

murder of Wilson at the BP. For those reasons, Cregut's argument is not persuasive. Because we find that only one attempt occurred, we find that this is not a multiple acts case.

Accordingly, we return to *Kleypas*, *Sweat*, and *Baker* and hold that because this is not a multiple acts case, a unanimity instruction was not legally appropriate. Thus, in this case, the trial court did not err in denying Cregut's request for a unanimity instruction in relation to the charge of attempted first-degree murder of Wilson.

As we have determined, the unanimity instruction was not legally appropriate and our consideration of the issue is complete. Nonetheless, we point out if we were to move forward to assess the harmlessness of the claimed error, we need only look to the overwhelming weight of the evidence of guilt in this case to see that Cregut's argument would fail. During trial, the jury was presented with evidence in the form of eyewitness testimony; surveillance video of the BP store; audio of 911 calls regarding the incident; audio of the phone call regarding negotiations between Cregut and law enforcement; video of Cregut's interviews with law enforcement; testimony from the law enforcement officers who interviewed Cregut; text messages between Cregut and Wilson; and Cregut's own admissions of guilt. Cregut faced an impressive array of evidence. But we do not assess the harmlessness here because there was no error. The unanimity instruction requested by Cregut was not legally appropriate.

*Did the Trial Court Abuse Its Discretion in Admitting the Audio From the 911 Calls?*

Cregut challenges the trial court's admission of the audio from certain 911 calls. He asserts that the trial court erred in admitting the calls because they presented a double hearsay situation.

17

The State offered the audio from the 911 calls at trial. To lay the foundation for the audio recordings, the State called the director of the 911 call center for the Shawnee County Sheriff's Office. The director testified that he prepared the audio recordings himself and that the recordings were true and accurate copies of the 911 calls. When the State offered the recordings at trial, Cregut's counsel launched a hearsay objection with respect to any witness on the recordings who would also be testifying. The trial judge asked the State to respond. The State argued: "Your Honor, these are business records kept by the Shawnee County Sheriff's Department. He maintains those. He's identified these as true and accurate copies of those recordings. They're non-testimonial statements. I know that's separate from hearsay, but I believe there is an exception for 911 calls." The trial court agreed with the State and admitted the 911 calls under the business records exception.

When the trial court admits evidence under a hearsay exception, the appellate court reviews the trial court's actions for an abuse of discretion. *State v. Seacat*, 303 Kan. 622, 634, 366 P.3d 208 (2016). "A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court, when the judicial action is based on an error of law, or when the judicial action is based on an error of fact. [Citation omitted.]" 303 Kan. at 634-35. Cregut argues that the trial court abused its discretion here by committing an error of law. Specifically, Cregut argues that the trial court failed to properly apply the statutory hearsay exception at trial. Because we are are required to review the statutory hearsay exception, our question involves statutory interpretation. Statutory interpretation is subject to unlimited review. *State v. Robinson*, 293 Kan. 1002, 1023, 270 P.3d 1183 (2012).

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offering to prove the truth of the matter stated, is hearsay evidence." K.S.A. 2016 Supp. 60-460. Hearsay is generally inadmissible save for certain statutory exceptions. Here, the 911 calls were admitted under the exception commonly referred to

18

as the business records exception. The business records exception is found in K.S.A. 2016 Supp. 60-460(m), which allows for certain records to be admitted so long as the following conditions are met:

> "Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that: (1) They were made in the regular course of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness."

Cregut argues that this exception was incorrectly applied by the trial court. Cregut asserts that the 911 calls provided a situation where there is hearsay within hearsay, or double hearsay. But "[a] statement within the scope of an exception to K.S.A. 60-460 shall not be inadmissible on the ground that it includes a statement made by another declarant and is offered to prove the truth of the included statement if such included statement itself meets the requirements of an exception." K.S.A. 60-463. Thus, if we are faced with a double hearsay situation then both levels of hearsay would need their own exceptions for the statements to be admissible. First, though, we must determine whether the audio recordings of the 911 calls present a double hearsay issue.

Cregut offers the case of *Doty v. Wells*, 9 Kan. App. 2d 378, 682 P.2d 672 (1984), in support of his argument. The dispute in *Doty* related to personal injury damages resulting from a rear-end car collision. The defendant proffered into evidence a physician's report prior to the car accident. The physician's report indicated that the plaintiff had told the physician that she suffered from headaches because of her age. On appeal, the court found the statements admissible based on exceptions to hearsay. The court discussed the situation:

> "[A]dmissibility of the record entries as business records only goes to proof that plaintiff, a declarant, made the nontestimonial statement recited in the records.

19

"In a double hearsay situation such as this, there arises a second question, that is, whether the declarant's nontestimonial statement, proved by evidence admitted under the business records exception, is itself admissible hearsay to prove the truth of the matter therein stated which, here, is that plaintiff suffered from headaches prior to the accident. We find and hold plaintiff's statement was admissible under either K.S.A. 60-460(a) (declarant present at the hearing and available for cross-examination) or K.S.A. 60-460(l)(2) (declarant's statement of previous symptoms, pain, or physical sensation, made to a physician consulted for treatment)." 9 Kan. App. 2d at 379.

Cregut acknowledges that "the State provided a basis for the 911 calls as admissible through the business records exception because they were records created by the call center," but he argues that "the district court erred in admitting the contents of the 911 calls for truth of their statements because they were double hearsay." Thus, Cregut argues that "[t]he current situation is analogous [to *Doty*] as it involves the recordings of the 911 calls made by police, business records, that had multiple callers describing events at the BP station, double hearsay statements because they were offered for the truth of those statements."

But Cregut is incorrect that the 911 calls present a situation analogous to *Doty*. In Cregut's analogy, the recordings of the 911 calls would be the physician's notes, and the callers' statements would be the plaintiff's statements to the physician. But here, we do not have that same disconnect that occurred in *Doty* between the plaintiff communicating her statements and the physician writing the statements down. Instead, we have the actual statements made by the callers. Said differently, the audio from the 911 calls presented to the jury does not represent the 911 dispatcher's statements about what the callers said—the audio from the 911 calls contains the callers' statements themselves.

The situation here is more analogous to *State v. Rainey*, 233 Kan. 13, 660 P.2d 544 (1983), which the State offers as support for its argument that the 911 audio recordings

20

were admissible under the business records exception and did not present an issue of double hearsay. In *Rainey*, the defendant challenged the admission of a tape recording of Kansas Highway Patrol radio communications. The trial court admitted the tape recordings under K.S.A. 60-460(m), the business records exception to hearsay. On appeal, our Supreme Court affirmed the trial court's finding that the tape recordings were properly admitted under the business records exception to hearsay. Additionally, the court found that "[t]he persons speaking during the radio transmissions were for the most part under the stress caused by their perception of the events; there was no incentive to falsify or distort. We hold thus that the tape recording was also admissible under K.S.A. . . . 60-460(d)." 233 Kan. at 17.

Here, a review of the audio from the calls makes it clear that the statements made by the callers in the 911 call recordings would have also fallen under the exception found in K.S.A. 2016 Supp. 60-460(d)—contemporaneous statements and statements admissible on ground of necessity generally. That exception allows for hearsay statements to be admitted when the following conditions are met:

> "A statement which the judge finds was made: (1) While the declarant was perceiving the event or condition which the statement narrates, describes or explains; (2) while the declarant was under the stress of a nervous excitement caused by such perception; or (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 2016 Supp. 60-460(d).

Like the radio communications in *Rainey*, the audio from the 911 calls here clearly shows that the callers were describing to the dispatcher events that they were presently perceiving; they were under the stress of the event; and the callers were communicating in good faith and with no incentive to falsify or to distort their statements. Thus, the

21

callers' statements would have also been admissible under the exception found in K.S.A. 2016 Supp. 60-460(d). Accordingly, the trial court properly admitted the 911 calls.

Moreover, insofar as Cregut argues that the statements made in the 911 calls needed to be supported by their own hearsay exceptions, K.S.A. 2016 Supp. 60-460(d) provides such exceptions, and that argument fails. Thus, even though we find that we are not faced with a double hearsay situation, if we were faced with this situation, Cregut's argument would also fail.

*Did Sufficient Evidence Exist to Support Cregut's Conviction for Aggravated Criminal Threat Resulting in the Evacuation of the Gas Station?*

Next, Cregut argues that his conviction for aggravated criminal threat was not supported by sufficient evidence.

> "When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. [Citation omitted.]" *State v. Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015).

In making its determination, the appellate court generally will not reweigh evidence or reassess the credibility of witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016).

Here, the elements that the State needed to prove were clearly laid out in jury instruction 27. That jury instruction reads:

> "The defendant is charged in Count 11 with the crime of aggravated criminal threat. The defendant pleads not guilty.

22

"To establish this charge, each of the following claims must be proved:

"1. The defendant threatened to commit violence and communicated the threat with reckless disregard of the risk of causing evacuation, lockdown, or disruption in regular ongoing activities of any building.

"2. A commercial building was evacuated *as a result of* the threat.

"3. This act occurred on or about the 30th day of June, 2014, in Shawnee County, Kansas." (Emphasis added.)

See K.S.A. 2016 Supp. 21-5415.

Cregut challenges the sufficiency of evidence supporting his conviction for aggravated criminal threat under K.S.A. 2016 Supp. 21-5415(b). Cregut attacks the second element listed above, arguing that "the evidence at trial did not support a conclusion that any evacuation occurred 'as a result of the threat.' K.S.A. [2016 Supp.] 21-5415(b)." Cregut specifically argues that "[w]hile the building was evacuated and held as a crime scene following the shooting, that occurred because of the other crimes committed in the building, not as a result of any threats made by Mr. Cregut while in the building."

The State simply argues that there was sufficient evidence to support Cregut's conviction for aggravated criminal threat because "[t]he building was clearly evacuated as a result of Cregut's threats."

The State's claim presupposes or assumes what it was required to prove; namely, that BP was evacuated as a result of the aggravated criminal threat. In spite of the State's claim, this was something the State was required to prove beyond a reasonable doubt: that Cregut's threats caused the evacuation of BP. Here, the evidence showed that the evacuation of BP occurred only after it became a crime scene—not as a result of the

23

threats made by Cregut while in the building. As a result, the State presented insufficient evidence to support a conviction of aggravated criminal threat. Therefore, we reverse Cregut's conviction of aggravated criminal threat.

*Did Sufficient Evidence Exist to Support Cregut's Conviction for Aggravated Burglary of the Gas Station?*

Finally, Cregut argues that his conviction for aggravated burglary was not supported by sufficient evidence. Specifically, Cregut argues that "[t]he State presented insufficient evidence to convict [him] . . . of the aggravated burglary of the BP station because the entering of the building was not 'without authority' because he had implied authorization to enter the store as a member of the public."

> "When the sufficiency of evidence is challenged in a criminal case, the appellate court reviews all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. [Citation omitted.]" *Laborde*, 303 Kan. at 6.

In making its determination, the appellate court generally will not reweigh evidence or reassess the credibility of witnesses. *Daws*, 303 Kan. at 789.

Here, the jury instruction on the count charging Cregut with aggravated burglary clearly laid out the elements that the State was required to prove for a conviction.

> "The defendant is charged in Count 10 with the crime of aggravated burglary. The defendant pleads not guilty.
>
> "To establish this charge, each of the following claims must be proved:

24

"1. The defendant entered or remained in the BP Amoco located at 1401 SW Huntoon.

"2. The defendant did so *without authority*.

"3. The defendant did so with the intent to commit attempted murder, kidnapping, stalking, or aggravated assault.

"4. At the time there was a human being inside the BP Amoco located at 1401 SW Huntoon.

"5. This act occurred on or about the 30th day of June, 2014, in Shawnee County, Kansas." (Emphasis added.)

As we have already noted, Cregut's argument is very specific and relates only to whether he entered the BP without authority. Cregut argues that he had implied authority to enter the store as a member of the public.

"The implied authority to enter a store's premises is a species of license the owner of the property . . . extends to members of the public in order to transact business. [Citation omitted.]" *State v. Acevedo*, 49 Kan. App. 2d 655, 660, 315 P.3d 261 (2013). Because members of the public have implied authority to enter stores during business hours, the State must prove that a person charged with aggravated burglary lacked such authority under the circumstances. *State v. Adams*, No. 106,935, 2013 WL 4046396, at *4 (Kan. App. 2013) (unpublished opinion).

In *Adams*, a woman was caught stealing from a Dillons grocery store on 30th Street in Hutchinson, Kansas (30th Street Dillons). An employee of the store called the police. In the presence of the law enforcement officer who reported to the scene, the manager of the 30th Street Dillons told the woman "that 'she would be banned from Dillons which means Dillons stores and the parking lot and Kwik Shops, and if she was found in one of the Dillons stores again that the police would be called and she would be trespassing.'" 2013 WL 4046396, at *1. About 5 months later, the woman was caught stealing from a different Dillons grocery store located on 4th Street in Hutchinson,

25

Kansas (4th Street Dillons). The woman argued to the trial court that she thought she was only banned from the 30th Street Dillons. She was charged and convicted of aggravated burglary in connection with the second incident. 2013 WL 4046396, at *2-4.

On appeal, the woman argued that "there was insufficient evidence at trial to prove . . . that she entered the 4th Street Dillons without authority." 2013 WL 4046396, at *4. The court found the woman's argument unpersuasive in light of the evidence that the State presented at trial. That evidence included testimony from the manager of the 30th Street Dillons that he had told the woman she was no longer welcome at any Dillons location. The manager's testimony was corroborated by the police report taken at the scene of the first incident. Additionally, both the manager and the law enforcement officer testified that the woman seemed as though she understood the ban. 2013 WL 4046396, at *5. Thus, the court held that the evidence was sufficient to support the woman's conviction for aggravated burglary. 2013 WL 4046396, at *5.

Here, Cregut offers *Adams* in support of the assertion that "[f]requently, . . . lack of authority is established by the store's notification that a defendant is not allowed in the store in the future." And based on *Adams*, that is a true statement. *Adams* exhibits *one way* in which a public store may revoke an individual's implied authority to enter. But what *Adams* does not support is Cregut's assertion that "there was no evidence put forth that Mr. Cregut's implied authority to enter was revoked at the time he entered the BP station." That assertion completely disregards clear and corroborated evidence that the State offered at trial. Cregut was stopped at the door of the BP by Snyder, who was holding the door shut. Snyder then told Cregut through the door that he needed to leave or move on. Instead, Cregut used his handgun to gain access to the store by shooting Snyder, thereby removing what he saw as an impediment to his entry.

It is true that, unlike *Adams*, the BP manager did not have a conversation with Cregut explaining to him that he was not welcome at the store in the future. Instead,

26

Cregut was confronted by Snyder who was physically restricting his access to the BP and orally communicating to him that he needed to leave. Moreover, Hajek testified that the only reason he did not lock the door to keep Cregut out was because he did not have his keys with him when Cregut approached the store. Still, Hajek testified that Cregut did not have permission to come inside the BP.

When Detective Cole asked Cregut what he did when Snyder barred his entry into BP, Cregut said, "Obviously, I shot the guy." So when Cregut shot Snyder because he held the door closed and told Cregut to move on, Cregut implicitly conceded that he did not have implied authority to enter BP as a member of the public. Accordingly, we hold that Cregut's conviction for aggravated burglary was supported by sufficient evidence.

Affirmed in part and reversed in part.